# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Vistas Construction of Illinois, Inc. | ) | ASBCA Nos. 58479, 58480, 58481 |
| | ) | 58482, 58483, 58486 |
| | ) | 58487, 58488 |
| Under Contract No. W912P8-08-C-0036 | ) | |

APPEARANCES FOR THE APPELLANT:     Thomas O. Mason, Esq.
                                   Francis E. Purcell, Jr., Esq.
                                     Cooley LLP
                                     Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Thomas H. Gourlay, Jr., Esq.
                                     Engineer Chief Trial Attorney
                                   William G. Meiners, Esq.
                                     Engineer Trial Attorney
                                     U.S. Army Engineer District, New Orleans

## OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

These appeals arise out of a contract between appellant, Vistas Construction of Illinois, Inc. (Vistas), and the U.S. Army Corps of Engineers, New Orleans District, (Corps) to enlarge a levee in Louisiana. After the conclusion of the project, Vistas submitted a request for equitable adjustment (REA) seeking more than $17 million for a variety of issues, which it later certified as a claim. The contracting officer decided that Vistas was entitled to about $1.15 million. Vistas appealed to the Board, which assigned the discrete issues 10 ASBCA numbers of which eight remain.[1] The Board held a four-day hearing in Falls Church, Virginia, from 26-29 January 2015. At the hearing, the Board admitted large Rule 4 file supplements from both parties, including Vistas' REA, which alone consists of more than 44 volumes. Both entitlement and quantum are before us. For the reasons set forth in this opinion we sustain ASBCA Nos. 58483 and 58488 in part. All other appeals are denied or dismissed.

## FINDINGS OF FACT

*The Project*

The contract is a post-Hurricane Katrina project at Lake Cataouatche in Jefferson Parish, Louisiana, which provided for the enlargement of approximately 5,000 feet of

---

[1] ASBCA Nos. 58484 and 58485 were previously dismissed at the request of appellant.

levee. The work included placement of bedding stone, construction of temporary granular fill closures, granular fill, compacted and uncompacted fills, installation of two rows of 54-inch diameter double walled plastic pipe culverts, excavation within the existing drainage canal, levee degrading, sheetpile installation, grouted stone scour protection, rip rap, and above and below water surface geotextile placement. Vistas agreed to perform the work for a firm-fixed-price of $14,622,356.54. (Ex. A-883 (hereinafter "REA"), tab E.1 at 5; R4, tab 1 at 1; R4, appx. at 1, 3)

The contracting officer executed the contract on 19 March 2008 and issued a notice to proceed on 28 March 2008 (R4, tab 6). Vistas started work on-site on 24 April 2008 (supp. R4, tab 69 at 3; tr. 2/25). The contract provided for completion within 320 days (R4, app'x, tab A, § 00700, ¶ 52.211-10).

*Changes to the Work*

Almost immediately, Vistas discovered a problem with the contract drawings, which it described in a letter to the Corps dated 9 May 2008 (R4, tab 7 at 1). The Request for Proposals (RFP) included drawing L-04 (New Sheet Pile and Culvert Section – Typical Section 1). In the RFP, this drawing indicated in a 325-foot section from station 121+75 to 125+00 that the levee would be constructed with a 1 vertical, 4 horizontal (1V on 4H) slope of compacted fill (REA, tab E.1 at 566). For unexplained reasons, the executed contract contained a different version of L-04, which included a new detail showing a slope of 1V on 12H of uncompacted fill from station 121+25 to 123+43, a distance of about 218 feet. From station 123+43 to 125+00 the drawing was consistent with the RFP drawing in that it depicted a 1V on 4H slope of compacted fill. (*Compare* REA, tab E.1 at 566 with tab E.2 at 106 & R4, app'x, tab B at L-04)

The geometry of the 1V on 12H slope was not feasible because it would have extended the work outside the right of way (tr. 3/82). Nevertheless, Vistas stated in its 9 May 2008 letter that field representatives of the Corps had directed Vistas to "continue placing compacted fill in the canal per the 1V to 12H slope detail" (R4, tab 7 at 2). Because more fill would be required to construct the 1V on 12H slope, Vistas also asked the Corps to "clarify how the additional fill materials are to be paid for" (*id.*).

The Corps seemingly solved the problem four weeks later on 6 June 2008 when it issued Modification No. A00002 (A00002). This modification included a new L-04, in which the detail showing the 1V on 12H slope had been removed. The drawing now indicated that the entire length from station 121+75 to 125+00 would be a 1V on 4H slope of compacted fill, just as depicted in the RFP drawings. (supp. R4, tab 8 at 3, 4)

With respect to compensation for the changed work, A00002 provided that no partial payments would be made under the modification. Rather, payment would be directed by a separate modification containing an agreed upon equitable adjustment. (Supp. R4, tab 8 at 3)

2

Vistas began performing the work with the 1V on 4H slope, but a new problem developed before the parties definitized A00002. At 2:00 p.m. on 13 July 2008, the Corps' inspector noticed that the embankment had begun to fail, that is, it had begun to shear and move towards the water in a nearby ditch. The inspector directed Vistas to stop work for safety reasons. (Supp. R4, tab75 at GOV46816-17) On the following day, that same inspector described the incident as "a severe embankment failure" (*id.* at GOV46812). This embankment failure occurred in the 168 feet between station 121+75 and 123+43; thus it was within the area that went from a 1V on 4H slope in the RFP drawings, to 1V on 12H after award, and then back to 1V on 4H in A00002. The Corps absolved Vistas of any responsibility for the slope failure and recognized that the design needed to be changed (supp. R4, tab 13 at GOV43196).

The area where the work had to be stopped due to the slope failure was on the critical path for the project and, due to phasing in the contract, there was no other work available (supp. R4, tab 13 at GOV43196). While the Corps approved some out-of-sequence work, it is clear that the slope failure caused a major delay (*see id.*).

The Corps did not change the design immediately; it required until 7 October 2008 to issue Modification No. P00001 (P00001) to repair the drainage canal slope failure and to revise the pipe installation procedure (supp. R4, tab 28 at 1-2). The modification included a new L-04, which now depicted a 1V on 7H slope of compacted fill from station 123+43 to 125+00 (supp. R4, 8 April 2015 filing), which would have been adjacent to the area that suffered the slope failure.

P00001 contained only a short explanation of the nature of the change, stating that "[t]his modification is to repair the drainage canal side slope failure and to revise the pipe installation procedure." It then listed seven drawings and six specification sections that were being replaced. (Supp. R4, tab G-28 at 2)

In a memorandum to the Corps Office of Counsel from Stuart Waits, P.E., chief, construction division, dated 27 August 2012, Mr. Waits described the P00001 work as "changing the pipe installation method." Mr. Waits stated that before P00001, Vistas would excavate the canal, add geotextile fabric, add bedding material, then dewater and place pipe culvert. After the modification, Vistas was required to dewater prior to excavation. (App. supp. R4, tab 1157 at 2, ¶ 17)

At the hearing, the Corps construction manager, Ezra Batte, elaborated on the difficulties presented by dewatering prior to excavation. According to Mr. Batte, excavating in wet conditions in some respects is more difficult than a dry excavation because the contractor has to pull the dirt through water and place it on the ground where it does not hold any particular form. The contractor has to wait for the dirt to dry on the ground or place it in a lined truck that will hold the water. However, excavating in the dry presented Vistas a different set of problems because the weight of the water was no longer there to hold the side slopes in place, and cave-ins occurred. Moreover, when Vistas

3

placed the rock, mudwaves began to develop; Vistas would then push the mud waves out of the way and excavate again. (Tr. 3/84-85)

In terms of payment for the changed work, P00001, like A00002, stated that the modification did not include any additional payment and that any such change would occur through a separate modification containing an agreed upon equitable adjustment. The modification contained a definitization schedule that provided for Vistas to submit a proposal by 6 November 2008, for negotiations to begin on 17 November, and for a modification to issue by 28 November 2008. (Supp. R4, tab 28 at 2-3)

During this time period, the Corps believed that it would be entitled to a credit as a result of P00001. A 22 September 2008 memorandum from the Corps engineering division to the construction division estimated the savings at $1,685,692 (app. supp. R4, tab 78 at 3) and, as late as 23 January 2009, the Corps still estimated the credit to be more than $1 million (supp. R4, tab 17 at GOV43072). At the hearing, Mr. Batte attributed these conclusions to the relative inexperience of his predecessor as construction manager and her focus upon the cost savings that resulted from excavating "in the dry" without recognizing the increased difficulties that it presented (tr. 3/84).

*The Vistas' Proposal and the DCAA Audit*

Due to the expectation of a credit for the P00001 work, the Corps must have been quite surprised when it received a proposal from Vistas on 19 December 2008 seeking more than $18.5 million to perform the changed work (REA, tab E.9). The proposal included a six-page letter from Vistas along with more than 400 pages of spreadsheets and other documentation. Notably, for reasons which will become clear when we discuss the amounts for profit and G&A in the REA, Vistas sought 10% profit and 10% G&A in the 19 December proposal (*id.* at 173).

On 22 January 2009, the contracting officer wrote to Vistas instructing it to "resubmit its proposal in accordance with the format specified in Table 15-2, (INSTRUCTIONS FOR SUBMITTING COST/PRICE PROPOSALS WHEN COST OR PRICING DATA ARE REQUIRED), of FAR 15.408" (app. supp. R4, tab 186). She also informed Vistas that the Corps would require an audit under FAR 15.404-2, which effectively made the rapid definitization schedule impossible. Vistas thereafter revised the proposal in letters dated 19 February 2009 and 13 March 2009 (R4, tabs 14-15). In the 13 March submission, Vistas raised the amount it sought to $24,826,181.78, although the amount now also included the work involved with modification A00007 dated 5 February 2009, which addressed differential settlement of culvert pipe (R4, tab 15 at 2).

The contracting officer informed Vistas that the audit could take up to 90 days to complete (app. supp. R4, tab 193 at 3). DCAA did not issue its report, however, until 4 June 2010, more than 16 months later (supp. R4, tab 14). The lack of a completed audit impeded the Corps' ability to definitize and pay Vistas for the P00001 work. We discuss

the audit and a related criminal investigation in more detail below in our discussion of ASBCA No. 58483.

*The Corps Makes Partial Payments to Vistas*

The parties agree that during the course of the project the Corps made 19 payments to Vistas totaling $21,246,217.77 (R4, tab 1 at 6; tr. 2/21-22). These records reflect regular invoices and payments to Vistas from June to December 2008:

| No. | Invoice Date | Due Date | Amount |
|-----|-------------|----------|--------|
| 1 | 09 Jun 2008 | 23 June 2008 | $1,448, 303.22 |
| 2 | 02 Jul 2008 | 16 July 2008 | $ 1,923,125.19 |
| 3 | 14 Aug 2008 | 28 Aug 2008 | $ 566.08 |
| 4 | 02 Oct 2008 | 02 Oct 2008 | $ 393,908.70 |
| 5 | 20 Nov 2008 | 04 Dec 2008 | $ 2,462,634.36 |
| | | **Subtotal:** | **$ 6,228,537.55** |

(R4, tab 1 at 6, tab 29)

Due to the language in A00002 and P00001 (as well as other modifications), which provided that there would be no partial payments and that payment would be made only after the issuance of an agreed upon modification, Vistas temporarily stopped submitting invoices after invoice no. 5 dated 20 November 2008 (R4, tab 1 at 6). On 20 January 2009, Vistas' president, Samuel Zepeda, Jr., wrote to the contracting officer requesting an interim payment (app. supp. R4, tab 180). Mr. Zepeda observed that in light of the DCAA audit he anticipated two or more months before Vistas could submit another payment application but that it could not withstand the financial impact of not billing on the contract and continuing to finance the changed work (*id.*).

On the following day, 21 January 2009, the contracting officer, Cynthia Nicholas, wrote to another Corps official, Timothy Roth, stating "there are several small modifications on this contract that are old. I thought I could give him a partial pay on the large one that Jenny is working on but since talking with her I don't think that is possible at this time." (App. supp. R4, tab 184) ("Jenny" is presumably Jennifer Honeycutt, the construction manager at that time.) Ms. Nicholas further stated "Is there any way we can get some of these smaller ones finalized so we can pay him. He is an 8(a) contractor and I feel like these small mods could be done very quickly and easily." (*Id.*)

By letter dated 23 January 2009, the contracting officer requested a meeting with Vistas on 3 February 2009 "to discuss the possibility of a partial payment." She further stated that "I do understand that you have not been able to invoice the Government for payment since October 31, 2008, and as a small business, you must have income to finance your operations." (App. supp. R4, tab 193)

The parties met on 3 February as planned (App. supp. R4, tab 1157 at 2, ¶ 24), leading to the issuance on 19 February 2008 of Modification No. P00003 (P00003), which provided for a partial payment of $500,000 for the P00001 work (supp. R4, tab 28 at 5-6). The Corps thereafter paid Vistas this amount.

The record reflects fairly regular payments by the Corps to Vistas from March 2009 until July 2010, when, as discussed below, the Corps deleted the remaining work from Vistas' contract:

| No. | Invoice Date | Due Date | Amount |
|---|---|---|---|
| 6 | 11 Mar 2009 | 25 Mar 2009 | $ 601,653.99 |
| 7 | 18 Mar 2009 | 01 Apr 2009 | $ 290,000.00 |
| 8 | 14 May 2009 | 28 May 2009 | $ 1,700,000.00 |
| 9 | 01 Jul 2009 | 15 July 2009 | $ 924,431.54 |
| 10 | 4 Sept 2009 | 18 Sept 2009 | $ 2,500,000.00 |
| 11 | 26 Oct 2009 | 09 Nov 2009 | $ 1,132,943.21 |
| 12 | 18 Dec 2009 | 01 Jan 2010 | $ 1,400,000.00 |
| 13 | 01 Mar 2010 | 15 Mar 2010 | $ 965,000.00 |
| 14 | 21 Apr 2010 | 05 May 2010 | $ 1,664,999.99 |
| 15 | 28 May 2010 | 11 June 2010 | $ 846,146.82 |
| 16 | 29 Jun 2010 | 13 Jul 2010 | $ 992,504.97 |
| | | **Subtotal Invoice 1-16** | **$19,246,218.07** |

(R4, tab 1 at 6, tab 29 at 16-49)

The invoices Vistas submitted after invoice no. 6 included significant amounts for the A00002 and P00001 work. In fact, the record indicates that the payments for invoice nos. 8 to 16 were almost entirely directed at the A00002 and (mostly) the P00001 work. (Supp. R4, tab 28 at 8-39; R4, tab 29 at 22-51)

On 26 July 2010, the contracting officer issued Modification No. P00017 (P00017), which deleted the remaining contract work (supp. R4, tab 28 at 40). At the hearing, the contracting officer testified that she issued this modification because the Corps was "trying to meet schedules and Vistas was having a hard time completing the project" (tr. 4/80).

*The Corps Adopts a Total Cost Approach and Vistas Submits an REA*

By the time DCAA issued the audit report on Vistas' revised proposal on 4 June 2010, Vistas had been working on the project for more than two years and had performed most of the work it would perform due to the deletion of the remaining work the following month as noted above. Thus, by the time that DCAA issued its report, the report was largely irrelevant because Vistas had performed the work and there was actual cost data.

6

According to Mr. Batte, the Corps faced a dilemma in determining how to finalize compensation for the modifications. On the one hand, it did not see a way to measure the difference in time and cost between excavating in the dry versus the wet. Although the Corps based its determination that Vistas was entitled to additional compensation for P00001 on the mud waves that developed, Mr. Batte testified that the wet excavation may also have presented problems with such waves. (Tr. 3/96) In addition, Mr. Batte testified that while the 1V on 7H slope required more dirt to construct, it was also easier to operate heavy equipment on the more gradual slope (tr. 3/83, 97).

Mr. Batte discussed how to proceed with his supervisor; they were concerned that by paying Vistas on a total cost basis the Corps would be paying for cost increases for which the Corps was not responsible. However, they settled upon the total cost method for lack of a better alternative. (Tr. 3/96, 99)

It is clear that there was a wide gap in the parties' expectations as to how Vistas should proceed with finalizing compensation for the modifications. Mr. Batte testified that he asked for "a simple accounting of their, what I would call hard costs. Labor, materials, supplies, subcontractors, etcetera, field office overhead, you know whatever they spent essentially." Mr. Batte informed both Samuel and Ignacio Zepeda (Vistas president and project manager, respectively) of these expectations in June 2010. (Tr. 3/99-100)

Vistas ultimately took more than 10 months after the discussions with Mr. Batte to prepare its REA, which is dated 26 April 2011. (Vistas later submitted a one-page certification of the REA as a claim on 3 May 2012 (R4, tab 4)). Vistas rejected the Corps' total cost approach using what it referred to as "a reasonable actual cost approach and estimates of cost." (REA, Executive Summary (exec. summ.) at 2).

The REA contains a 23-page executive summary, followed by a 29-page methodology of cost allocation with attached letters from its cost expert and attorneys. These materials are then followed by 44 binders of information. The heart of the analysis is contained in the first 26 binders, which contain five "levels" of "work papers," that is, spreadsheets, in some cases quite lengthy, detailing various costs and calculations, along with supporting documents.

In the REA, Vistas claimed entitlement to a total contract sum of $36,990,484.71. Subtracting contract payments of $19,246,218.07, it sought a net amount of $17,744,266.64. (Exec. summ. at 20-21)

Subsequent to Vistas' submission of the REA, the Corps made three further payments to Vistas in the latter part of 2011 and early 2012 totaling $2 million (R4, tab 1 at 6). The modifications that authorized these payments indicated that they were additional payments for the P00001 work (supp. R4, tab 28 at 43-60). These payments brought the total amount paid to Vistas to $21,246,218.07.

7

The Corps analyzed the REA by breaking it down into components such as labor, equipment, profit and other categories (*see* R4, tab 1 at 18). Because the Board adopted this approach when it assigned ASBCA numbers to the matters in dispute, and because Vistas adopted it when it filed its complaint, we will continue with that approach. We observe that there is no pending issue involving payment for labor, materials, or equipment on either the changed or unchanged work. The issues before the Board involve: G&A, profit, interest, costs to respond to the DCAA audit, bonding costs, and REA preparation costs.

## G&A Expenses – ASBCA No. 58479

## ADDITIONAL FINDINGS OF FACT

Vistas' initial bid price for this project was $16,050,700.86, which included an "overhead" rate of 10% (exec. summ. at 10; supp. R4, tab 22). After the contracting officer notified Vistas that its price was high, Vistas reduced its price by more than $1.4 million, which resulted in the contract price of $14,622,356.54 (exec. summ. at 6). Vistas achieved this lower price by reducing its profit and G&A (*id.*). The final contract price included G&A of 7.7% (supp. R4, tab 14 at 18; app. supp. R4, tab 413 at 8).

In Vistas' 19 December 2008 proposal for P00001, it requested "overhead" of 10% (R4, tab 11, last page; REA, tab E.9 at 173). In its 13 March 2009 amendment to that proposal, Vistas increased its "general and administrative overhead expense" from 10 to 14% (R4, tab 15 at 1).

In the REA, Vistas sought G&A of $2,585,601, or 13.7% of its direct costs (R4, tab 1 at 18; compl. ¶ 126). The REA stated that Vistas had used a "value-added cost input" basis as defined in 48 C.F.R. § 9904.410-50 (Cost Accounting Standards) to determine G&A (exec. summ. at 14). The difference between using the contractor's total costs and value-added cost input for the allocation base is that total cost includes everything except G&A while value-added removes materials and subcontractors from the base (tr. 3/54). 48 C.F.R. § 9904.410-50(d)(2). A value-added base is used where inclusion of material and subcontract costs would significantly distort the allocation of the G&A expense pool in relation to the benefits received, and where costs other than direct labor are significant measures of total activity (tr. 3/54). 48 C.F.R. § 9904.410-50(d)(2). Vistas attached to the REA a letter from its eventual expert at trial, Darrell J. Oyer, CPA. In his letter, Mr. Oyer stated that Vistas had used an "added value base" and opined that this was permissible under the FAR and appropriate under the circumstances (Oyer ltr. at 3 (exec. summ. at .pdf 56/83)).

In her final decision, the contracting officer determined that use of the value-added approach was not appropriate. Among other things, she observed that Vistas had used a total cost input method on all modifications. She took the 2008 G&A rate determined by DCAA, 8.5% (*see* R4, tab 25 at 19), and used that rate for the entire project. Multiplying 8.5% by total direct costs of $18,805,339, the contracting officer determined that Vistas was entitled to total G&A of $1,598,454, about $987,000 less than Vistas sought (R4, tab 1 at 8-9).

8

In its complaint, Vistas contended that it had properly used a value-added base "at the advice of its expert consultant" and that it was entitled to $2,585,601 in G&A costs, which amounted to a rate of 13.7% (compl. ¶ 126). In its prehearing brief filed just two weeks before the start of trial, Vistas continued to assert that it had used a valued-added base, but it now stated without explanation that it was entitled to application of a 13.5% rate (app. pre-hearing br. at 7-8).

*Vistas' Contentions at the Hearing*

At the hearing, Vistas changed its position. Vistas' director of corporate affairs and finance, Maribel Zepeda, testified that in calculating G&A, "we took our experts advice and utilized the total cost input to capture a fair and actual amount of G&A" (tr. 2/6). In fact, she went so far as to testify that she was not familiar with the value-added method and could not respond to a question about it (tr. 2/58). Subsequently, Mr. Oyer testified that Vistas had used a total cost input base (tr. 3/24), which contradicted his 25 April 2011 letter attached to the REA (exec. summ. at .pdf 54/83).

During cross-examination, Mr. Oyer was fairly adamant and convincing that total cost input was the proper method for calculating Vistas' G&A:

> Q. Now you state in this paragraph 10 that, in fact, Vistas used the total cost input method to calculate G&A. Is that correct?
>
> A. That's correct, yes.
>
> Q. And are you confident of that?
>
> A. Yes.
>
> Q. And so you also are confident that Vistas did not use the value added method to calculate G&A?
>
> A. Yes.
>
> ....
>
> Q. Now is it your expert opinion that in this case it is appropriate for Vistas to use the total cost input method to calculate G&A?
>
> A. Yes.

9

Q. And that it is, in fact, the most appropriate method, correct?

A. Yes.

Q. And why is that?

A. They did not have -- if you do a value added base, you need to also have subcontract administration material handling. So you can allocate some indirect costs to the materials and subcontracts. They don't get a free ride under the value added....

[T]he company had not set up material handling subcontract administration pool in the past. We would have to go back and do that retroactively which sometimes is frowned on by auditors.

Q. And so isn't it correct, Mr. Oyer, that in your review of the accounting records of Vistas, you determined that it was Vistas' established practice to calculate G&A based upon the total cost input method?

A. Yes.

Q. And isn't it correct that to your knowledge, Vistas has never used a value added method to calculate G&A?

A. Not to my knowledge.

(Tr. 3/54-56)

During the government's cross-examination of Mr. Oyer an explanation for Vistas' switch to a total cost input base emerged: using a rate of 13.7% and a value-added base would actually reduce the amount of G&A to which Vistas is entitled to about $1.3 million, or about $300,000 *less* than the contracting officer awarded in her final decision (tr. 3/59-60; R4, tab 1 at 18).

Vistas also called Louis Butler, the consultant who worked with Vistas during the project, as a witness. Contrary to Ms. Zepeda and Mr. Oyer, Mr. Butler testified that "[w]e used the value added approach" because Vistas had to subcontract out a project in Chicago that it had planned to self-perform (tr. 2/155-56). Mr. Butler, who describes himself as "a CPA" but "not a practicing CPA" (tr. 2/167), did not seem aware that Vistas had switched

10

to advocating a total cost input base; he testified that use of the value-added approach "was obviously supported" and "ratified by" Mr. Oyer (tr. 2/156).

Mr. Butler testified as a fact witness not as an expert. His work for Vistas included preparation of the work papers in which Vistas calculated its REA, including the G&A calculation (tr. 1/130, 137, 2/13-14, 18, 155-58). Unfortunately, Mr. Butler seemed unsure on how he had calculated the G&A; he was not able to explain how he calculated the amount sought despite repeated questions from Vistas' attorney on direct examination (tr. 2/155-65).

In its initial post-hearing brief, Vistas continued to maintain that it had used a total cost input approach, that it was entitled to a G&A of 13.7%, and total G&A of $2,585,601 (app. br. at 24). Vistas stated that it had "mislabel[ed]" the methodology in the REA but requested that the Board apply a total cost input rate and award it $2,585,601 (*id.*).

*The Government's Position*

In its brief, the government made a convincing case that Vistas had, in fact, used a value-added base in the REA. The government analyzed the REA work papers for the four periods that Vistas divides its claim.[2] For example, one of the periods of time is calendar year 2009, for which Vistas calculates the appropriate amount of G&A to be $1,089,499.32 (*see* REA, tab D.8 at 65 (WP NN-2, Summary of General and Administrative Expenses Fiscal Year 2009)). Vistas arrived at this amount by calculating its total direct costs of construction for all jobs ($21,622,323.28) and then subtracting its material and subcontract costs for all jobs ($16,792,296.96) to reach a value-added base of $4,830,026.32.[3] Next, G&A expenses of $1,218,111.19 (REA, tab D.8 at 65 (WP NN-2)) are divided by the value-added base of $4,830,026.32, resulting in a rate of 25.2195559%. Finally, this rate is multiplied by the Lake Cataouatche direct costs (minus materials and subcontracts) of $4,320,057.51[4] (REA, tab D.8 at 16 (WP DD-2)), resulting in the $1,089,499.32 that Vistas sought for 2009[5] (REA, tab D.8 at 65, WP NN-2). The total G&A amount calculated by

---

[2] These periods are: 1 January to 15 November 2008; 16 November to 31 December 2008; 1 January to 31 December 2009; and 1 January to 30 September 2010 (*see, e.g.*, REA, tab D.2 at 169, tab D.8 at 63-66).

[3] These numbers come from REA, tab D.8 at 16 (WP DD-2, Profit Loss by Job). The calculation requires adding the numbers in the "Lake Cataouatche" and "All Other Contracts" columns. Thus, the total direct costs of construction are $7,297,681.28 + $14,324,642 = $21,622,323.28. From this amount, the numbers in lines 50300 (Direct Costs-Direct Materials) and 50400 (Direct Costs-Subcontractors) are subtracted. The value-added cost base is the sum of the amounts in the "Value-Added Cost Input" columns: $4,320,057.51 (Lake Cataouatche) + $509,968.81 (All Other Contracts) = $4,830,026.32.

[4] $7,297,681.28 – $2,977,623.77 = $4,320,057.51.

[5] $4,320,057.51 x .252195559 = $1,089,499.32.

11

Vistas for all time periods was $2,832,190.93[6], from which it deducted $246,589.95 in unallowable consulting and other costs, including nearly $100,000 for Kenneth Nix (REA, tab D.8 at 62/75), a consultant whose work is discussed below in our decision on the DCAA audit appeal, which resulted in the final claim number of $2,585,601.

The government provided its own calculations of G&A using a total cost input base:

| | Total Cost Rate | Total Project Costs | Amount |
|---|---|---|---|
| 2008 thru Nov. 15 | 11.406% | $5,988,349.17 | $683,031.11 |
| Nov. 16-Dec. 31, 2008 | 5.65% | $649,233.16 | $36,681.11 |
| 2009 | 5.63% | $7,297,681.28 | $410,859.46 |
| 2010 (thru Sept 30) | 12.085% | $4,116,512.80 | $497,480.57 |
| | | **Total =** | **$1,628,052.25** |

(Gov't br. at 39)  By way of example, for 2009, the government divided the G&A expenses of $1,218,111.19 for all jobs by the total direct costs of construction for all jobs of $21,622,323.28 (*see* REA, tab D.8 at 16 and n.2 above), to arrive at the rate of 5.63%.[7] Then, it took total Lake Cataouatche direct constructions costs for 2009 of $7,297,681.28[8] and multiplied it by 5.63% to arrive at total cost input G&A of $410,859.46.[9]

The amount that the government calculates for G&A, $1,628,052.25, is about $30,000 higher than the amount awarded by the contracting officer (R4, tab 1 at 18).  But, as the government observes, Vistas has also conceded that $246,589.95 should be

---

[6] **Dates**

| Dates | G&A Amount | Citation |
|---|---|---|
| 01/01/08-11/15/08 | $ 654,275.68 | REA tab D.2 at 169 |
| 11/16/08-12/31/08 | $ 37,906.04 | REA tab D.8 at 63 |
| 01/01/09-12/31/09 | $ 1,089,499.32 | REA tab D.8 at 65 |
| 01/01/10-09/30/10 | $ 1,050,509.89 | REA tab D.8 at 66 |
| | =$2,832,190.93 | |

[7] $1,218,111.19 ÷ $21,622,323.28 = 5.63%.
[8] *See* REA, tab D.8 at 16 (WP DD-2) in the row marked "Total COGS [cost of goods sold]" in the Lake Cataouatche column.
[9] $7,297,681.28 x .0563 = $410,859.46.

deducted from the final G&A number because of unallowable costs, including $98,250 for Kenneth Nix (REA, tab D.8 at 62, 67 (WPs NN & NN-4.1)). Thus, the government concludes that Vistas has been overpaid by more than $200,000.

*Vistas' Reply Brief*

Faced with the government's computations, Vistas abandoned total cost input in its reply brief; it now concedes that it used value-added but contends that this is the proper approach. It does not attempt to explain the testimony of Ms. Zepeda or Mr. Oyer, but it does provide an all new set of calculations using both the value-added method and, in the alternative, the total cost method. Under the value-added method, it now contends that the proper calculation is $3,345,032.16, but states that it is not requesting more than the $2,585,601 it sought in its claim (app. reply at 11).

In its total cost input calculation, Vistas calculates that it is entitled to $1,905,485.64, or about $307,000 more than the contracting officer awarded (app. reply at 11). Vistas' calculations contain minor differences in the November – December 2008 and the January – December 2009 time periods as compared to the Corps (*compare* app. reply at 9 and gov't br. at 39). However, its calculations contain significant differences for 1 January through 15 November 2008 ($927,170.88 vs. $683,031.11 for the Corps) and for 2010 ($589,732.70 vs. $497,480.57) (*id.*). But Vistas' new calculations have obvious errors. For one thing, it adjusts the 2008 G&A expenses through 15 November up from $754,769.82 to $1,016,974.94, an increase of $262,205.12 (app. reply at 9). The source of this calculation, Work Paper N, the summary of G&A expenses through 15 November, does not support this change. This work paper contains an amount for "Allowable G&A Expenses" of $754,769.82, the G&A amount for all contracts for the entire year. Because more than 86% of this amount was attributable to Lake Cataouatche, it further states that $654,275.68 is for "Allowable G&A Chargeable to Corps contract." (REA, tab D.2 at 169/173) The $654,275.68 is further broken down into $262,205.12, which is "Allowable G&A Expense incurred prior to April 24, 2008 initiation of field operations," and $392,070.56, which is "Allowable G&A Expense incurred subsequent to April 24, 2008 initiation of field operations" (*id.*). Thus, the $262,205.12 is a component of the $754,769.82, not a separate amount that should be added to it.

Second, for this same time period in 2008, Vistas increases the total direct costs of construction of all jobs from $6,617,269.84 to $11,245,398.83 by adding $2,180,097.07 in materials and $2,448,032.42 in subcontracts (app. reply at 9). But Work Paper N-1, Profit Loss by Job Jan 1- Nov 15, 2008, clearly indicates that the materials and subcontract costs are already included in the $6,617,269.84[10] (REA, tab D.2 at 172).

---

[10] This amount is calculated by adding "Total COGS" of $5,988,349.17 for Lake Cataouatche and $628,920.67 for "All other contracts." Note that these amounts already include lines 50300 - Direct Costs-Direct Materials, and 50400

13

Finally, Vistas' calculations for 2010 are different from the Corps because it uses a total G&A amount of $1,477,749.42 instead of the $1,244,116.37 used by the Corps (*compare* app. reply at 9 & gov't brief at 38). Vistas' use of this number appears to be an error. It cites REA tab D.8, Work Paper DD-3, Profit Loss by Job, in support of its assertion. This work paper does contain the number $1,477,749.42, but it appears in the row entitled "Net Income." (REA, tab D.8 at 17) The number used by the Corps is contained in Work Paper NN-3, Summary of General and Administrative Expenses, in the column entitled "Distributable G&A Overhead Pool" and the row marked "Total G&A" (REA, tab D.8 at 66). Thus, we find that the Corps used the correct number.

## DECISION

When a contractor files an appeal or lawsuit challenging a contracting officer's final decision, the findings of fact in that decision are not binding and are not entitled to any deference. The claimant has the burden of proving the fundamental facts of liability and damages *de novo*. *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc). Once an action is brought following a contracting officer's decision, the parties start before the Board with a "clean slate." *Id.* at 1402. The Board has the authority to decrease or increase the amount awarded by the contracting officer. *Id.* at 1401 (citing *Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed. Cir. 1987)).

The basic question to be resolved in Vistas' G&A claim is whether the contracting officer awarded Vistas the proper amount. However, we must first decide whether Vistas may use a value-added base despite its historical use of total cost input. In *PACCAR, Inc.*, ASBCA No. 27978, 89-2 BCA ¶ 21,696 at 109,080, we observed that it is well established that a change in the method of accounting for indirect costs may be justified under special circumstances in order to produce equitable results, and that "the change may be retroactive where unusual circumstances in the contractor's operations do not become apparent" until the time proximate to the requested change. *Id.* (citing *Celesco Industries, Inc.*, ASBCA No. 20569, 77-1 BCA ¶ 12,445; *Zero Manufacturing Co.*, ASBCA No. 14558, 70-2 BCA ¶ 8489); FAR 31.203(e) (2008). The Board has been reluctant to permit either party to benefit from retroactive accounting changes. *Id.* (citing *Falcon Research and Development Co.*, ASBCA No. 19784, 77-1 BCA ¶ 12,312; *Celesco Industries, Inc.*, ASBCA No. 23165, 80-1 BCA ¶ 14,455), and have taken note of the "commercial havoc" that could result by permitting the practice in the absence of "peculiar" circumstances. *Id.* (citing *Blue Cross and Blue Shield Ass'n*, ASBCA No. 26529, 86-2 BCA ¶ 18,751, *aff'd*, 13 Cl. Ct. 710, *aff'd*, 852 F.2d 1294 (Fed. Cir. 1988) (table).

We conclude that Vistas has not carried its burden of demonstrating that retroactive application of a value-added base is appropriate. We reach this conclusion

---

- Direct Costs-Subcontractors. Thus, Vistas double counts materials and subcontractors in its reply brief.

14

based not only on the head-spinning changes in Vistas' position, which undermine its case, but also on several other considerations. First, the only company employee who testified on this issue, Maribel Zepeda, Vistas' director of corporate affairs and finance, testified that she had never heard of the value-added method and understood Vistas to be using a total cost input method. This significantly undercuts any assertion that the company made a reasoned determination that a switch to a value-added base would be appropriate. Second, Vistas' retained expert, Darrell Oyer, opined at trial that total cost input was the appropriate base. In support of his conclusion, Mr. Oyer cited Vistas' historical use of total cost input, its failure to establish a material handling subcontract administration pool, and the fact that retroactive changes are "frowned on by auditors" (tr. 3/56). Mr. Oyer also candidly admitted that application of the value-added base at the 13.7% rate claimed by Vistas would result in a significantly lower award than that calculated by the contracting officer.

Third, although Louis Butler testified that Vistas had used a value-added base in calculating the REA, his testimony overall was rather vague and unhelpful on this issue. Although Mr. Butler did testify that Vistas had used a value-added base in the REA because Vistas had experienced increased subcontracting on a project in Chicago (tr. 2/155-56), his inability to explain how he had calculated the G&A despite repeated questions from Vistas' attorney on direct examination causes us to give his testimony little weight. Moreover, it would seem to us that the witness in the best position to explain how Vistas' subcontracting needs on the Chicago project necessitated a switch to a value-added base would have been Ms. Zepeda, but she provided no such testimony.

The question then becomes whether Vistas is entitled to the $1,905,485.64 that it contends it is entitled to if total cost input is used, or to some other amount in excess of the $1,598,454 awarded by the contracting officer using total cost input. We have already found that the $1,905,485.64 calculation contains three errors that inflate the amount sought. Given our conclusion, we will not address whether it is appropriate to consider calculations raised for the first time in a reply brief.

The Corps has calculated the total cost input G&A to be $1,628,052.25 minus $246,589.95 in consulting and other costs that Vistas removed from the claim because they represent unallowable costs. This would result in a final amount of $1,381,462.30 and would mean that the contracting officer overpaid Vistas by more than $200,000. We find the calculation of the $1,628,052.25 to be convincing. The methodology the Corps used is similar to that used by Vistas in its reply; they reach different conclusions simply because Vistas' calculations contain incorrect numbers, as we have found.

In its reply brief, Vistas did not challenge the Corps' assertion that Vistas had subtracted $246,589.95 in unallowable costs from the REA, nor did it challenge the Corps' assertion that this amount should be deducted from the final G&A calculation, whether it was value-added or total cost input. Accordingly, we agree with the government that

15

Vistas was entitled to $1,381,462.30 in G&A on its certified claim. Because this is less than the amount granted by the contracting officer, we deny the appeal.

## Profit – ASBCA No. 58480

## ADDITIONAL FINDINGS OF FACT

The majority of the money that Vistas is seeking is profit: $4,421,891.60 on what it refers to as the firm-fixed-price contract work (that is, the work not affected by modifications or other impacts, *see* exec. summ. at 10-11); plus $4,573,921.84 on the undefinitized modifications, including P00001 (*id.*; app. br. at 20); and, although not addressed in Vistas' opening post-hearing brief, $131,292.44 in profit for work performed on negotiated, definitized modifications. Given the magnitude of these amounts (more than $9.1 million), some discussion of the profit levels and method of calculation is in order.

*Vistas' Profit in its Proposals*

Vistas' initial bid price included profit of seven percent (exec. summ. at 10; supp. R4, tab 22). After Vistas reduced its G&A and profit by more than $1.4 million, Vistas' final proposal included profit of just 4.44% (supp. R4, tab 14 at 21; app. supp. R4, tab 413 at 8).

As described above, when Vistas submitted its original proposal for P00001, it sought profit of 10 % (REA, tab E.9 at 33). By its second revision to this proposal on 13 March 2009, Vistas had increased profit to 10.29% (R4, tab 15 at 2). Negotiated modifications A00003, A00004, and A00005 contained profit rates of 7.71, 9.35, and 10.0%, respectively (methodology at 26).

In the REA, Vistas acknowledged that it was a small business with no prior experience in levee enlargements and that it entered into the contract knowing that it would encounter a steep learning curve (exec. summ. at 5). Vistas alleged that the Corps improperly induced it to reduce its offer by $1.4 million (*id.* at 6-10). It further stated that, during construction it encountered a host of problems, including the unavailability of the entire project site, errors in other drawings besides L-04, and the design issues that led to the embankment failure (*id.* at 6-7). While these ingredients – a low bid price, an inexperienced contractor, erroneous drawings, an allegedly unscrupulous agency, and difficult working conditions – might lead one to expect a loss on the project, that is not Vistas' contention here. Rather, it contends that, due to its "productivity, efficiencies and value engineering" (exec. summ. at 12), it made a profit of $4,421,891.60 on the firm-fixed-price contract work (*id.* at 11, 20). But Vistas did not offer any evidence at the hearing that proved any productivity, efficiencies or value engineering. Vistas nevertheless contends that it earned a 34.81 profit on the firm-fixed-price work. Vistas seeks to apply the same 34.81% profit to the undefinitized modifications, bringing the total profit for these two items to nearly $9 million.

16

As we observed above, Vistas' has submitted volumes of information in support of its damage calculations, much of which is difficult to review. However, at the highest level, Vistas' profit calculations are easily understood. It contends that it received $12,702,495.70 in payments from the Corps for the firm-fixed-price (unchanged) contract work and that it incurred $10,012,708.90 in costs for such work (Methodology at 26). It contends that, because this latter amount was incurred over 869 days instead of the original 320 days, it incurred unabsorbed indirect costs and escalations in prices and wage rates amounting to $1,817,555.21; subtracting this amount from its costs results in an "actual cost" of performing the firm-fixed-price contract work of $8,280,604.10. (*Id.*) Finally, $12,702,495.70 in payments minus $8,280,604.10 in costs, minus $85,450.41 in allocable bond premiums equals $4,421,891.60 in profit.[11] While it is reasonable to contemplate that costs may increase if work is performed over a much longer period of time, Vistas did not spend any time at the hearing or in its briefs explaining how it calculated more than $1.8 million in unabsorbed costs and price escalations. Further, both Vistas' calculation of the amounts it received from the Corps for the firm-fixed-price contract work, and the cost of performing that work, have problems.

*Vistas' Calculation of Amounts Paid for the Firm-Fixed-Price Work*

With respect to the amount paid to Vistas, this much is known: the Corps made five payments to Vistas totaling $6,228,537.55 for the period through the end of October 2008, the month that the contracting officer issued P00001. Vistas characterizes all of this as payments for the firm-fixed-price contract work (Methodology at 26). However, this amount is still less than half of the $12,702,495.70 that Vistas contends it received for that work. Vistas closes this gap by characterizing nearly $6.5 million in what it refers to as "unallocated partial payments" as payments for the firm-fixed-price contract work (*id.*). Vistas identifies these payments in Work Paper B (Summary of Contract Payments by COE) (REA, tab D.1 at 48). However, a review of Work Paper B and the pertinent contract modifications readily indicates that these payments were for P00001 work (the changed work), not the unchanged work.

For example, on 1 September 2009, the contracting officer issued Modification No. P00007 in the amount of $2.5 million (supp. R4, tab 28 at 17-19). The modification specifically stated that it was a "partial payment in the amount of $2,500,000.00 for Modification P00001" (*id.* at 18). Vistas submitted an invoice three days later, and the Corps paid Vistas the $2.5 million on 18 September 2009 (R4, tab 1 at 6). Thus, it is hard for us to believe that Vistas did not realize that the 18 September payment was for P00001. In fact, in its post-hearing fact brief, Vistas acknowledges that the payment was for P00001:

> 163. On September 1, 2009, the Corps issued unilateral
> Modification P00007, which increased the Contract price by

---

[11] 12,702,495.70 − (10,012,708.90 - 1,817,555.21) − 85,450.41 = 4,421,891.60

$2,500,000 as partial payment for the changed work
required by Modification P00001. R4 Vol I Tab C at 21-22.

But in Work Paper B Vistas allocated all of the $2.5 million to the firm-fixed-price contract work, and none to P00001 work (REA, tab D.1 at 48). Thus, Vistas' post-hearing brief contradicts the REA.

Similarly, as described above, Mr. Zepeda wrote to the Corps on 20 January 2009 requesting payment for the undefinitized modifications, including A00002 and P00001 (app. supp. R4, tab 180). The parties met to discuss his request and the contracting officer issued Modification No. P00003 on 19 February 2009, which approved payment of $500,000 to Vistas for the P00001 work (supp. R4, tab 28 at 5). Despite this history, in Work Paper B, Vistas allocated this $500,000 to the firm-fixed-price contract work (REA, tab D.1 at 48). Yet, in paragraph 81 of its post-hearing fact brief, Vistas acknowledged that this payment was for P00001. Again, we are puzzled by these inconsistent positions.

Based on the foregoing, we find Vistas' contention that it received $12,702,495.70 in payments for the firm-fixed-price contract work to be unproven. Vistas has no evidence that nearly $6.5 million in payments designated by the contracting officer for P00001 were really payments for the unchanged work. While we accept as true that Vistas received $6,228,537.55 in payments for the firm-fixed-price work, this is all that Vistas has proven. This amount by itself would result in a loss on the firm-fixed-price work, even if we accepted Vistas' contention that it incurred $8,280,604.10 in costs to perform that work, which we discuss next.

*Vistas' Calculation of Costs to Perform the Firm-Fixed-Price Contract Work*

A.    $1,817,555.21 in Unabsorbed Indirect and Escalation Costs

We find Vistas calculation of $8,280,604.10 in costs to perform the firm-fixed-price contract work to be even more problematic than its calculation of the amounts paid for that work. First, Vistas actually calculates that it cost $10,012,708.90 to perform the firm-fixed-price work (Methodology at 26). However, it subtracts $1,817,555.21 in what it refers to as unabsorbed indirect and escalation costs. As best we can tell, this amount is somehow derived from the calculations in: Work Paper (WP) A (Detail of Request for Equitable Adjustment); WP A-3 (Increased Costs CLIN 0001); WP A-3.1 ("Should Have Cost" Labor Burden); WP A-3.2 ("Should Have Cost" Labor Burden); WP A-3.3 (FFP Equipment Should Have Cost); WP A-3.4 (CLIN 0007 Trucking Should Have Cost); WP C (Summary Analysis and Allocation of Costs Incurred, Apr 24, 2008 – Nov 15, 2008); and WP CC (Summary of Contract Performance), plus any further work papers to which these papers cite. (*See* REA, tab D.1 at 1, 17-39, tab D.2 at 1-18,

18

tab D.8 at 1-10). These work papers are nearly impenetrable due to their complexity.[12] While these work papers might have provided some support for the claimed amount if a witness had explained the methodology, identified the underlying source of information, and made that documentation available to the Board, none of this occurred. The principal architect of the REA, Louis Butler, testified, but neither he nor any other Vistas witness explained how Vistas calculated the unabsorbed indirect and escalation costs. The spreadsheets are not helpful standing alone and we do not give them any weight.

### B.      Vistas' Calculation of Costs to Perform the Unchanged Work

In evaluating Vistas' contention that it cost $10,012,708.90 to perform the firm-fixed-price work, several basic questions arise, namely: what were Vistas' total costs on the project; how did Vistas determine whether costs arose from the changed or unchanged work; and how accurate was its methodology. In Work Paper A, Vistas indicates that its "Total Cost Incurred Through General and Administrative Expense" for the project was $23,555,257.15 (REA, tab D.1 at 1). Subtracting $10,012,708.90 for the unchanged work, results in a total of $13,542,548.25 in costs incurred on changed work, according to Vistas. Vistas distributes this amount among item numbers 18 to 65, which it has created in addition to contract line item numbers (CLINs) 1-17 in the original contract (*id.*; R4, appx., tab A at 3; tr. 1/48). Vistas presented little evidence at the hearing explaining these additional items. However, it appears that Vistas contends that about $13.1 of the $13.5 million in costs is attributable to Modification Nos. P00001, A00002, and A00007 (which addressed differential settlement of culvert pipe but was the subject of only brief testimony). (*See* REA, tab D.1 at 1 ("transferring" costs of impacts in the amount of $571,689.59 and $6,970,709.10 to Mod. P00001 costs of $2,026,635.54 and then aggregating these amounts with A00007 costs of $3,204,974.64 and P00001 new activities costs of $365,213.03); tr. 1/41-42)

The accuracy of Vistas' method of segregating costs between changed and unchanged work is a matter of considerable controversy. The REA methodology of allocation contains a description of Vistas' process; Vistas also presented witness testimony explaining how it classified the costs.

### 1. Vistas' REA Methodology

In the REA methodology section, Vistas stated that it had derived its direct costs by performing an "extensive analysis" of "the direct labor hours cost recorded in the weekly certified payrolls submitted to the COE and of equipment hours/cost" (methodology at 5). Vistas stated that it analyzed the labor hours and cost reflected in the certified payrolls and segregated them into: i) definitized modifications; ii) all undefinitized modifications; iii) "its Impacts"; and iv) the firm-fixed-price contract (*id.*). However, it is not clear from the

---

[12]   For example, the work papers include A-3, which includes 18 pages of spreadsheets and, in turn, references work papers A-3.1, 3.2, 3.3, 3.5, A-8, C, and CC.

19

face of these payrolls how they could have been used to determine the labor to be allocated to the firm-fixed-price contract. While these documents list the names of workers, their hours for each work day, and their work classification, they do not identify the CLINs or the tasks performed by the worker that day, nor do they identify the equipment used (*see* supp. R4, tab 69). Vistas cites to various work papers (WPs F-2, FF-2, F-1, FF-1, C, CC, E and EE (Methodology at 6)) but does not explain how Vistas used the certified payrolls to untangle the firm-fixed-price work from P00001 and other impacted work.

With respect to equipment, Vistas submitted to the Corps a daily contractor's quality control report that the parties refer to as a daily report or daily log (*E.g.*, supp. R4, tab 70). Among other things, this report required Vistas to list the equipment used on the project on that day and to specify the operating and standby hours for each piece of equipment. The report requires the contractor to "certify that this Report is complete and correct" (e.g., *id.* at GOV46139). While these daily reports would seemingly be the foundation for any equipment costs in the claim, Vistas states that "the COE requested that Vistas amend the use of the [application for creating the report] as if we were working on a cost plus contract" (methodology at 6). Vistas contends that based on the directives it received from the Corps, both the operating and standby hours listed in the daily reports are "not reliable" (*id.*). Vistas has not, however, identified any contemporaneous document where it protested or documented an alleged demand by the Corps to under report equipment hours.

Vistas stated that it instead used the certified payrolls to determine equipment hours, just as it did with the labor costs (methodology at 6). However, just as with labor, it is not clear from the face of these payrolls how they could have been used to determine the equipment to be allocated to the firm-fixed-price work because they do not identify the equipment used (*see* supp. R4, tab 69).

An explanation begins to emerge in the REA Executive Summary, in which Vistas stated that it had used the "certified payroll records, daily reports and accounting records as primary source data" for the REA. While this statement appears to be inconsistent with the statement in the REA Methodology section that the daily reports are not accurate, Vistas clarified this assertion in a footnote. Vistas stated that it included with the REA copies of its daily reports "with notations to assist USACE in any reconstruction of the costs and estimates" and that it also included copies of the certified payrolls. (Exec. summ. at 13 and n.59)

Review of the daily reports and certified payrolls submitted with the REA indicate that Vistas did not merely add notations to "assist" the Corps; it essentially re-wrote these documents when it drafted the REA. For example, Vistas submitted a signed daily report to the Corps for 23 May 2008. In that report, Vistas certified that no work was performed due to previous weather conditions and that there were no equipment hours being reported (supp. R4, tab 70 at GOV47009-10). By contrast, in the REA Vistas submitted an unsigned copy of this document in which it hand wrote 34 equipment operating hours

20

(REA, tab D.5.1 at 128/376). Vistas' superintendent, Fernando Balderas, testified that he added these notations to the daily reports when Vistas prepared the REA (tr. 1/84, 90).

Similarly, Vistas hand wrote in the certified payrolls the pieces of equipment that the employee allegedly used that day (e.g., REA, tab D.7 at 7/220; tr. 1/97). Apparently, the final step in this process was the creation of work papers that purported to assign the equipment and labor to specific items, which, in turn, allowed Vistas to allocate these costs to the changed or unchanged work (REA, tabs D.3, D.6, D.9, D.10.1, D.10.2).

By taking such liberties with previously certified information, Vistas dramatically increased its equipment operating hours. In its daily reports, it kept a cumulative total of equipment operating hours. For 15 November 2008 (the last day of what Vistas refers to as Period 1), Vistas certified that it had 8,043.5 equipment operating hours to date (supp. R4, tab 70 at GOV46335). Yet, in Work Paper E-1.1, the Period 1 Hour and Cost Summary created for the April 2011 REA, Vistas asserted that it had 16,125 operating hours, more than double the number in the daily reports (REA, tab D.2 at 29/173). This work paper further indicated that more than 90% of these hours had been expended on items 18 to 65 that represented the changed work (id.).

### 2. Vistas' Testimony Concerning Profit Methodology

Perhaps realizing the problem with its methodology, Vistas' employees took a new tack at the hearing, testifying that all of the data in the REA was based on contemporaneous documentation. Thus, at the hearing it identified a new source document that had gone unmentioned in the REA: time sheets. Mr. Balderas, (the superintendent), testified that each day he recorded on a time sheet the hours for each worker and the CLIN upon which he or she worked (tr. 1/56). Vistas' project manager, Ignacio Zepeda, testified that they used the time sheets to determine equipment hours for the REA (tr. 1/114-15). When asked what was the "base set of documents that you used to prepare your REA?", Mr. Zepeda responded "Certified payrolls and then time sheets" (tr. 1/177). Similarly, Maribel Zepeda testified:

> So we utilized primarily that timesheet, those payroll records, other contract records, letters and transmittals that had been sent to the government. All kind of daily correspondence with them to use in this segregation effort....

(Tr. 2/16)

According to Maribel Zepeda, Vistas derived Work Paper F-4, Weekly Labor Allocation (REA, tab D.6) from the time sheets (tr. 2/19-20, 38-39). Work Paper F-4 is a 132-page document that contains various spreadsheets that purport to show the CLIN upon which each Vistas employee worked and the amount of costs allocated to each CLIN as a result of that labor. She testified that Vistas' effort to segregate costs to the

21

firm-fixed-price contract began with the time sheets and their classification of the work into various CLINs (tr. 2/15-16).

The time sheets are not in the record and there is no reference to them in the REA Executive Summary or Methodology of Cost Allocation. This is particularly noteworthy because in the 44 volume REA, Vistas included virtually everything else but the kitchen sink. For example, despite stating that the information in the daily reports is "not reliable," Vistas included 8 binders of those daily reports in the REA (*see* REA, tabs D.5.1-5.8). Yet, it contends that, in the time sheets, it has contemporaneous documents that identify the CLINs on which its employees performed their work and the CLINs on which each piece of equipment was used (tr. 1/103, 115, 177, 2/15-16), but that it neglected to mention them or attach them to the REA.

After Messrs. Balderas and Zepeda had testified, and at the conclusion of the direct examination of Ms. Zepeda, counsel for Vistas sought to move the time records into evidence (tr. 2/39-40). This drew an immediate objection from the government's counsel who noted that the time to supplement the record had passed and that the government had specifically requested these documents in discovery but had been told by Vistas that the government had all of its records. Vistas' attorney conceded that the government had requested these documents in discovery (tr. 2/40). Vistas still had not provided the time records to the government at this time, but counsel stated that he could "get them this week" (tr. 2/42). Based on this representation, and the representation of counsel that the information in the time records was the same as in the certified payrolls that were already in the record (tr. 2/40-42), the Board did not immediately rule on Vistas request to supplement the record or on the government's objection. Instead, the Board ordered Vistas to produce the records to the government, which could examine them and determine whether it still objected (tr. 2/ 43-44). The parties never reported back to the Board (except in the post-hearing briefs) and the time sheets have not been added to the record.

### 3. Louis Butler's Testimony

Mr. Butler, the consultant who worked with Vistas during the project, testified that he set up the process for separating the costs of the changed and unchanged work (tr. 2/132). Mr. Butler stated that he wrote the Methodology of Cost Allocation (tr. 2/134) and that he was responsible for allocating costs between the changed and unchanged work (tr. 2/144-45). Notably, Mr. Butler did not testify that he had relied upon the time sheets in preparing the REA. Moreover, Mr. Butler's billing records in the months leading up to the submission of the REA contain no mention of the time sheets; rather, they point squarely to his use of the certified payrolls to calculate the REA.

Thus, in an entry for 9 September 2010 in which Mr. Butler billed nine hours, he wrote:

> Preparation of Vistas' REA proposal.... The general ledger activity for 2008 and 2009 was reconciled to company's published financial statements; direct cost was allocated to "scopes of contract performance" <u>based on analyses of certified payrolls</u> prepared by Vistas field overhead personnel....

(REA, tab D.13 at 56/178) (Underlining added) Similarly, in an entry for 27 January 2011 in which Mr. Butler billed 10.5 hours, he wrote:

> Preparation of submission documentation of Vistas' REA proposal, which was primarily based on extensive and detailed <u>analysis and segregation of direct labor based on certified payrolls,</u> field overhead time, EP 1110 equipment cost calculations....

(*Id.* at 58-59/178) (Underlining added) After each of these quoted provisions Mr. Butler's billing summaries also include numerous entries stating that he is continuing preparation of the REA proposal "as described above" (*id.* at 56-59/178).

In its post-hearing brief, the government represented that Vistas never provided it with the time sheets that the Board had directed Vistas to provide to the government. In its reply brief, Vistas does not dispute this (app. reply at 26). Vistas has not explained why it failed to provide these records either in discovery or in response to the Board's order.

*The Accuracy of Vistas' Calculations of Cost to Perform the Firm-Fixed-Price Work*

In evaluating the reasonableness of Vistas methodology of assigning costs to changed or unchanged work, one question that comes to mind is how could Vistas identify two to three years after the fact the equipment that a particular worker used on any particular day. During his testimony, Superintendent Balderas offered an explanation, he suggested that operators always used the same piece of equipment, so this allowed him to use labor hours to identify equipment used (tr. 1/60-61, 63-64). Yet, as the government points out in its brief, this is exactly the opposite of what Vistas told DCAA in a 1 September 2009 letter. In that letter, Vistas stated that it allowed its operators to "float" between multiple pieces of equipment, "which would negate any tie-in between labor hours and equipment usage" (ex. A-458 at 24/75).

In its brief, the government contends that there are hundreds of errors in Vistas' calculation of labor and equipment hours (gov't br. at 85). The government then spends 12 pages of its brief providing examples of these errors. These errors include: conflicts

23

between the certified payrolls and the labor or equipment allocation sheets; claimed equipment hours when there were no operators present to operate that equipment, specifically, for Period 1 the government calculates that there are more than 1,900 more equipment hours billed than there were hours recorded for laborers; and conflicts between the information submitted in Vistas' original P00001 proposal and the REA, including equipment listed in the proposal as having been idle that it changed in the REA to have been operating, and changes to the CLINs upon which employees performed their work. (Gov't br. at 86-97) In its reply, Vistas does not dispute any of the errors that the government identified; it just dismisses the government's analysis as finding "a few alleged errors" (app. reply at 35).

*Vistas' Calculation of Profit on Definitized Modifications*

As a fallback position, Vistas requests that the Board award it the 24.41% profit it contends that it earned on definitized Modification Nos. A00003 (clay veneer change), A00004 (emergency preparation for Hurricane Gustav), A00005 (interim storm scour protection, and A00017 (Bypass pumping) (*see* exec. summ. at 20). This profit contrasts with the negotiated profit percentages on A00003, A00004, and A00005 of 7.71, 9.35, and 10.0%, respectively (*see* methodology at 26).

According to the REA Executive Summary, Vistas received payments for these modifications totaling $535,305.44, while the cost of performing the work was $406,500.29 (exec. summ. at 20). Vistas' method of assigning costs to the definitized modifications is apparently the same method it used to assign costs to the firm-fixed-price contract work (methodology at 5).

*The Contracting Officer's Decision*

In the contracting officer's final decision, Ms. Nicholas agreed that Vistas is entitled to a fair profit on its work but determined that Vistas had not substantiated the 34.81 profit rate that it had requested. Ms. Nicholas applied the weighted guidelines in EFARS (Engineer FAR Suppplement) 15.404-73-100 then in effect and determined that a profit rate of 8.7% was appropriate (R4, tab 1 at 9). Thus, she concluded that Vistas was entitled to $1,105,117 on the firm-fixed-price contract work, $634,647 on the undefinitized modifications, and $35,366 on the definitized modifications (*id.* at 18).

DECISION

The parties disagree as to the proper methodology for calculating damages. In her final decision, the contracting officer used a total cost method to which she then applied the weighted guidelines to determine the profit rate (R4, tab 1 at 6), while Vistas advocates use of actual costs. Under the total cost method, the measure of damages is the difference between the actual cost of the contract and the contractor's bid. The total cost method of recovery is not favored and will not be used if there is another, more reliable

method available by which to establish the contractor's damages. *Hi-Shear Technology Corp. v. United States*, 356 F.3d 1372, 1383 (Fed. Cir. 2004).

We have no quarrel with Vistas' contention that it is entitled to the actual profit it earned on the unchanged work. However, Vistas has not demonstrated that it earned any profit on the unchanged work, and certainly has not demonstrated that it earned profit of 34.81%. First, Vistas simply asks us to accept at face value its assertion that its "productivity, efficiencies and value engineering" led to such a high profit rate, even in the face of its own inexperience and the challenges that this project presented. The Corps contends that this profit rate is unreasonable on its face and should be rejected by the Board. (Gov't br. at 59) While we believe that this is an overstatement, it is fair to say that Vistas' failure to explain what it did to earn such a healthy profit rate causes us to view the claim with some skepticism.

Second, as we have found, Vistas has not proven that the Corps paid Vistas $12,702,495.70 to perform the unchanged work. Vistas' unilateral designation of payments that were designated for P00001 as payments for the unchanged work is self-serving and unreasonable. We are mystified that Vistas on the one hand concedes in its post-hearing fact brief that these payments were for P00001, but still includes them in its $12.7 million calculation of payments for the unchanged work. Vistas' method is sufficiently arbitrary that it could just as easily contend that it had received $10, $12, or $14 million in payments from the Corps without it being any more or less unreasonable than the $12.7 million it contends it received.

Third, as we have found, Vistas has not demonstrated that it incurred unabsorbed indirect costs and escalations in prices and wage rates amounting to $1,817,555.21. While there may be some information in the myriad work papers submitted with the REA that would flesh this out, we do not consider work papers prepared by a consultant to be probative in the absence of witness testimony or other evidence that gives substance to it.

Fourth, we are troubled by Vistas' alleged reliance on the time sheets and its failure to produce them. Vistas has both shirked its discovery obligations and disregarded the direction of the Board to provide these documents to the government. It seems rather odd to us that Vistas would have spent the time to rewrite multiple volumes of certified payrolls and daily reports if it had contemporaneous records that proved its case. Moreover, it also seems to us that, if Vistas had relied on the time sheets, it would have mentioned them in the REA Executive Summary or Methodology of Cost Allocation, and that Louis Butler, as the author of the Methodology and the person behind the REA preparation, would have mentioned them in his billing records. In place of the time sheets, Vistas has submitted certified payrolls and daily reports marked up long after the fact. As the Supreme Court has explained, "[t]he production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing character." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939) (citations omitted). Accordingly,

we draw the inference that if Vistas had produced the time sheets, they would not have been favorable to its case.

Fifth, we have volumes of daily reports certified by Vistas' employees as being true and accurate. Vistas witnesses now ask the Board to ignore those certifications and accept as true the heavily edited daily reports, which provide a much different version of the events on the project. We find it very difficult to believe that Vistas would have under reported its equipment hours by more than 8,000 hours in the period from April to 15 November 2008 without at least protesting or documenting some alleged direction by the Corps to misrepresent the actual hours. Combined with the mystery of the never-produced time sheets, this has seriously undermined the credibility of Vistas' witnesses.

Finally, we agree with the government that there are serious errors and inconsistencies in Vistas' calculations of the labor and equipment to be allocated to the changed and unchanged work. Based on the methodology Vistas used, its profit on the unchanged work would have increased whenever it allocated costs to the changed work. Thus, it was incumbent on Vistas to demonstrate that its methodology was accurate and reasonable. But its witnesses never provided a satisfactory explanation with respect to the criteria that they used to determine the CLINs upon which its employees worked and its equipment operated for each day on the project. Although it would be difficult to quantify the exact magnitude of the errors in Vistas' calculations, the government has demonstrated through its cross examination of Vistas' witnesses and the many examples it provided in its brief, that Vistas' marked up certified payrolls and daily reports, and its labor and equipment allocation work papers, contain a critical mass of errors. Thus, even if there were not all of the other problems we just described, we still would not accept that Vistas had incurred $10,012,708.90 to perform the unchanged work.

Vistas seeks to apply the same profit rate on the undefinitized modifications, including P00001 (methodology at 26). Thus, because its profit calculation fails on the unchanged work, it also fails with respect to P00001 and any other undefinitized modification. Although Vistas invites the Board to award additional profit based on a jury verdict approach, there is no basis for us to do so. As we have already discussed, there is no evidence that Vistas earned any profit on the unchanged work that could be extrapolated to the changed work. Moreover, Vistas has not provided us with any analysis or argument concerning the contracting officer's application of the EFARS weighted guidelines that would provide a basis for increasing the 8.7% profit she awarded.

Finally, with respect to profit on the undefinitized modifications, we do not understand what Vistas seeks. The REA Executive Summary appears to indicate that: Vistas had been paid $535,305.78 to perform these modifications; that it had cost Vistas $406,500.29 to perform these modifications; and that $2,486.95 remained to be paid on modification P00017. Summing this up, Vistas stated that it had earned $131,292.44 on these modifications. (Exec. summ. at 20) Vistas never explained why it contends it was entitled to an additional $131,292.44 (if that is its contention). No Vistas' witness explained

this at the hearing and Vistas did not address it in any of its post-hearing briefs. To the extent that Vistas has not abandoned this claim, we find that there is a complete failure of proof and that it is not entitled to any additional profit on these definitized modifications.

This appeal is denied.

<u>ASBCA No. 58481 – Change To Payment Terms</u>

<u>ADDITIONAL FINDINGS OF FACT</u>

In this claim, Vistas seeks $1,170,831 as a result of an alleged inability to invoice as a result of P00001 and other modifications that: a) required Vistas to proceed with the changed work; and b) provided for an agreed upon modification to be issued later (exec. summ. at 14-15). As described above, the rapid definitization schedule that the Corps originally envisioned for P00001 was derailed when Vistas submitted a much larger proposal than the Corps expected and the DCAA audit took more than five times longer than the Corps estimated. Among other things, this played at least some role in the gap between Vistas' submission of invoice no. 5 dated 20 November 2008 and invoice no. 6 dated 11 March 2009 (R4, tab 1 at 6). However, in her final decision denying this aspect of the claim, the contracting officer concluded that "P00001 did not remove Vista's [sic] right to submit progress payment invoices. Vistas still retained this fundamental right under the contract." (R4, tab 1 at 10)

Vistas' calculations for this issue are set forth in Work Papers A, A.1, and A.1.1 (REA, tab D.1 at 1-5). The calculations purportedly use the interest rates provided for in the Prompt Payment Act and are based on total contract earnings of $31,068,633.85. This amount includes profit on the firm-fixed-price work and on the undefinitized modifications totaling about $9 million, as discussed above.

Rather than focus on P00001 or other modifications, Vistas seeks interest going back to the beginning of the project. Vistas' calculations are based on a hypothetical reconstruction of history in which it submitted an invoice for a month's work on the last day of that month, making the payment due on the 14th day of the following month. Thus, it posits a scenario where it submitted its first invoice for contract earnings of $1,718,846.35 on 31 May 2008, which came due on 14 June 2008. (REA, tab D.1 at 2 (WP A-1, Summary of Prompt Payment Interest)) Because the Corps did not pay anything according to Work Paper A.1, $2,907.91 in interest accrued, which continued to increase thereafter (*id.*).

This scenario ignores the reality that Vistas submitted an invoice that was both smaller and later than in the scenario presented in the REA – it sought $1,448,303.22 on 9 June 2008 (R4, tab 1 at 6). There is no evidence that the Corps forced Vistas to submit its invoice on 9 June rather than 31 May. Further, the Corps timely paid the invoice (*id.*). In fact, as far as we can determine, there is no dispute that the Corps paid all of the invoices that Vistas submitted within 14 days (*id.*; tr. 2/21-22).

27

Similarly, in the following month, June 2008, Vistas posits a scenario where it submitted an invoice for $2,657,126.96 on 30 June, which thus came due on 14 July 2008 (REA, tab D.1 at 2). What really happened is that Vistas submitted an invoice for $1,923,125.19 on 2 July, which the Corps paid on time on 16 July 2008 (R4, tab 1 at 6). For reasons that are not clear, in the scenario presented in the REA work papers, Vistas credits the $1,448,303.22 paid for invoice no. 1 as a partial payment for invoice no. 2. Thus, because more than $1 million was left unpaid, and because interest apparently continued to accrue on invoice no. 1, the total interest due after month two more than quadrupled to $12,933.39 (REA, tab D.1 at 2). It then nearly doubled the following month to $25,703.82 (*id.*).

The contract contained FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002) (R4, appx., tab A, § 00700 at iii). This clause, among other things, provided that "The Government shall pay the Contractor the contract price as provided in this contract." FAR 52.232-5(a). The contract also incorporated FAR 52.232-27, PROMPT PAYMENT FOR CONSTRUCTION CONTRACTS (SEP 2005) (R4, appx., tab A, § 00700 at iii).

## DECISION

The Prompt Payment Act (PPA) provides in relevant part that "the head of an agency acquiring property or service from a business concern, who does not pay the concern for each complete delivered item of property or service by the required payment date, shall pay an interest penalty to the concern on the amount of the payment due." 31 U.S.C. § 3902(a). The contract's prompt payment clause provided that the due date for progress payments was 14 days after the billing officer received a proper payment request. The PPA further provides that it "does not require an interest penalty on a payment that is not made because of a dispute between the head of an agency and a business concern over the amount of payment or compliance with the contract." 31 U.S.C. § 3907(c).

In both its pre-hearing and post-hearing briefs, the government cited two Board cases that illustrate a limitation on the obligation to pay PPA interest. In *H.Z. & Company, Ltd.*, ASBCA No. 31055, 86-2 BCA ¶ 18,976, the appellant, like Vistas, performed changed work when directed to do so, but then sought interest due to the length of time it took to negotiate the price of the change and the cost of financing the work. *Id.* at 95,846-47, ¶¶ 35, 42. The contract at issue, like the contract in this case, required the government to pay "the contract price." *Id.* at 95,849. The Board denied the appeal, holding that until a change order had been formalized, the amount of money involved in that change could not be added to the value of the contract and that the government could not pay an amount greater than the contract price. *Id.*

More recently, in *Dick Pacific/GHEMM, JV*, ASBCA No. 55829, 08-2 BCA ¶ 33,937 at 167,942, we held that "there is nothing in the PPA or the Prompt Payment clause that would apply the PPA to alleged constructive withholdings based upon a

28

contractor's stated inability to invoice under modifications that have not been definitized." Similarly, the Court of Federal Claims has held that the government is only obligated to pay interest under the PPA when a payment is inadvertently late, not when the government refuses to pay or questions its underlying liability. *Laurelwood Homes LLC v. United States*, 78 Fed. Cl. 290, 293 (2007); *Inversa, S.A. v. United States*, 73 Fed. Cl. 245, 247 (2006).

Although the government cited *H.Z. & Company* and *Dick Pacific* in both its pre and post-hearing briefs, Vistas has not attempted to distinguish them. Accordingly, we are bound by our precedent. Vistas is not entitled to an interest penalty based upon the government's failure to pay an amount greater than the contract price. As we have found, from the time that Vistas submitted its original proposal for P00001 there has been a disagreement as to the amount the government owed Vistas and, in fact, the government originally thought P00001 would result in a credit to the government. Further, there is no dispute that the government paid all of the invoices in the amount specified within 14 days. Thus, there is no basis for the award of interest under the PPA. This appeal is denied.

### ASBCA No. 58482 – Interest Impact on Borrowings

### ADDITONAL FINDINGS OF FACT

Vistas seeks $266,740.15 in interest owed to an affiliated company due to increased borrowing that resulted from the gaps in payment on this project. According to Maribel Zepeda, Vistas was unable to obtain financing from a bank so it turned to an affiliate, Vistas Belize Limited (Vistas Belize) (tr. 2/53). Vistas Belize is wholly owned by appellant (methodology at 52). Vistas' calculation of its damages is contained at Work Paper A-6.1, Accrual of Interest on Borrowings (REA, tab D.1 at 43). This work paper references a promissory note in the amount of $962,472.96 dated 29 December 2006 (supp. R4, tab 6). This note provided for an interest rate of 4.99%. It also contained a payment schedule that called for repayment in full by 30 September 2007, or about six months before the parties entered into the contract at issue. However, it appears that Vistas made only one payment of $137,499.99 and two smaller payments totaling about $10,000, and, based on the language of the note, Vistas appears to have been in default at the time it entered into the contract with the Corps. Work Paper A-6.1 also indicates that Vistas continued to borrow money from Vistas Belize in 2008-09 so that the total principal outstanding reached $1,939,911.29, or about double the face value of the note. While there is a second promissory note in the record (supp. R4, tab 5) that would accommodate such borrowing, Vistas did not reference it in its work papers.

Ms. Zepeda acknowledged that Vistas had borrowed money from Vistas Belize in the past, but testified that the gaps in payments on this project resulted in an increase in the need to borrow, which led to increased interest payments (tr. 1/214, 2/51-52). Work Paper A-6.1 shows a total of $314,389.09 in accrued interest (REA, tab D.1 at 43), of

which it is seeking $266,740.15. The Corps has not challenged Vistas' calculation of quantum on this item.

The contract incorporates Defense Federal Acquisition Regulation Supplement (DFARS) 252.243-7001, PRICING OF CONTRACT MODIFICATIONS (DEC 1991) (R4, app'x, tab A, § 00700 at iv). This clause provides: "When costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR part 31...in effect on the date of this contract, apply." Part 31 appears to bar the interest that Vistas seeks, providing in subsection 31.205-20, Interest and other financial costs, that "Interest on borrowings (however represented)...[is] unallowable."

## DECISION

Vistas relies upon *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994), in which the Federal Circuit held that "a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." *Wickham*, however, must be read with a caveat because, as the Court of Federal Claims has explained, the decision by the General Services Board of Contract Appeals under review in that case did not address the predecessor regulation to FAR 31.205-20, which contained the same substantive provision barring payment of interest on borrowed funds. Thus, the *Wickham* court did not have the opportunity to address the effect of this regulation. *Northern States Power Co. v. United States*, 78 Fed. Cl. 449, 471 n.16 (2007).

The Federal Circuit has come to a different result when it has addressed FAR 31.205-20 or a similar regulation. *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 863 (Fed. Cir. 1991). In *Servidone* the Federal Circuit upheld the Claims Court's denial of a claim for interest on funds borrowed to cover excess costs because the contract incorporated a Defense Acquisition Regulation provision that, like the provision applicable in this case, provided that "[i]nterest on borrowed funds (however represented) [is] unallowable." *Servidone Constr. Corp. v. United States*, 19 Cl. Ct. 346, 383 (1990); *accord VA Venture Pueblo, LLC v. Principi*, 119 F. App'x 274 (Fed. Cir. 2004) (affirming Veterans Board of Contract Appeals decision denying interest based on FAR 31.205-20); *Centennial Leasing v. Austin*, 17 F.3d 1443 (Fed. Cir. 1994) (table) (affirming General Services Board of Contract Appeals decision denying financing costs based on FAR 31.205-20); *Tomahawk Construction Co.*, ASBCA No. 45071, 94-1 BCA ¶ 26,312.

Because the contract bars the interest that Vistas seeks, this appeal is denied.

ADDITIONAL FINDINGS OF FACT

*The Audit*

The audit of Vistas' P00001 proposal unfolded in what could be described as three phases. Phase I began in late January 2009 when the Corps requested the audit and Vistas retained Mr. Butler (supp. R4, tab 23). Mr. Butler began charging his time to the DCAA audit on 21 January 2009 (REA, tab D.13 at 36).

The audit appears to have started without any problems; as late as 3 March 2009, DCAA indicated that its field work would be complete by 23 March, and its report issued by 31 March 2009 (app. supp. R4, tab 260 at 2). However, the original auditor soon became concerned about an evolving scope for the audit (app. supp. R4, tab 314 at 2-3, tab 362 at 1-2, tab 365 at 1-4). In late April, DCAA concluded that Vistas' proposal should be treated as an REA and that it would appoint a new auditor, Howard Salita (app. supp. R4, tab 381).

Phase II began in late April with the appointment of Mr. Salita. Vistas soon began registering complaints with the contracting officer and DCAA about the volume of information Mr. Salita was requesting (supp. R4, tab 48) and his inquiries into technical aspects of the contract (app. supp. R4, tab 552). According to Maribel Zepeda, Mr. Salita, came to Vistas' office "18 times, whole days on occasions" (tr. 1/196). Ms. Zepeda testified that her interactions with Mr. Salita were a "grinding dialogue." Further, she stated that:

> [W]e had to sit here and walk him through every aspect of
> the proposal. He went layer after layer after layer he
> would ask for one thing. We would have to support the
> thing with another thing below, below, below. It got down
> to having to provide him cancelled checks....

(*Id.*)

On 20 July 2009, a DCAA supervisory auditor informed Vistas that the audit would be completed by the end of September (app. supp. R4, tab 606). Mr. Salita's field work ended on 14 August 2009 and DCAA conducted an exit conference on 18 August 2009, thus ending Phase II (supp. R4, tab 55 at 1; app. supp. R4, tab 690.1).

Phase III took place from the exit conference until 4 June 2010 when DCAA issued its report. Why it took so long to issue the report is not entirely clear and Mr. Salita's absence as a witness makes our factual inquiry more difficult. However, the record indicates that three levels of supervisors reviewed Mr. Salita's report and that they

were dissatisfied with some of his work product or conclusions. The supervisors identified problems in his report and pointed to specific provisions in the FAR and Defense Contract Audit Manual in support of their positions but Mr. Salita clung to his positions based on his notion of "equity." The internal debates at DCAA went on for months. (app. supp. R4, tab 769 (3 December 2009 email from DCAA branch manager to regional manager: "I've attached some emails sent to Howard to have him explain some inconsistencies/errors in the audit report. I'm trying to get to the bottom on it but it is difficult. A lot of Howard's numbers are not correct."), tabs 791, 795, 813, 828, 833, 834 (email from Salita to all three supervisors dated 19 February 2010 that stated: "My disagreement is based on equity... I don't think it is right to pay $3,000,000 that they have not incurred."), tabs 912, 918, 925). As these debates went on, the date for issuance of the report continued to slip. By early June 2010, the Corps had reached the limit of its patience. On 3 June 2010 the Corps sent the DCAA regional manager a scathing email that concluded with the Corps requesting that DCAA cancel the audit and return the $126,721 that the Corps had paid DCAA (app. supp. R4, tab 1012). DCAA issued its report the following day (supp. R4, tab 14).

Robert Starks was Mr. Salita's supervisor at DCAA. He became Mr. Salita's supervisor on 1 October 2008 – six weeks after the exit conference – and was not involved with this matter prior to that. (Tr. 4/8) He was the only DCAA witness who testified.

*The Criminal Investigation*

While DCAA was performing the audit, other government agencies were conducting a criminal investigation. It is not clear when Vistas began to suspect that the government was conducting such an investigation. However, Maribel Zepeda testified that by 7 July 2009 it had become "very apparent" that a criminal investigation was being conducted and Samuel Zepeda raised this as an issue at a meeting with the Corps (tr. 2/36). Because Mr. Zepeda did not testify, we do not know how much he knew by this point in time. However, as events unfolded it is clear that he had a good reason for concern: The Federal Bureau of Investigation (FBI) listed both Vistas and Mr. Zepeda as subjects of the investigation in a 5 October 2009 affidavit submitted in support of the search warrant application (supp. R4, tab 64 at 2289).

The contracting officer learned of the investigation on 10 June 2009 (ex. A-292). Mr. Salita met with the criminal investigators two to three times after an agent from the FBI contacted him (ex. A-876 at 41-42). Mr. Salita was cited as a source of information in the affidavit submitted with the search warrant application (supp. R4, tab 64 at 2294). There is no evidence that the Corps or DCAA initiated or directed the criminal investigation.

The investigation involved the execution of a search warrant at Vistas' job site and home office on 7 October 2009 (app. supp. R4, tab 738; tr. 1/73, 205-06). As a result of that investigation, Kenneth Nix, who worked at various times as a Vistas

32

employee or consultant and who was also a former contracting officer, and his wife, also a former contracting officer, were indicted and convicted by the government, although no witness specified the basis of the convictions (tr. 2/57-58). (According to the docket in the Western District of Texas, Mr. Nix pled guilty to filing false tax returns, 26 U.S.C. § 7206(1), and aiding and abetting, 18 U.S.C. § 2, and received a sentence of 30 months in prison (W.D. Tex. No. SA-11-CR-523-OLG, Dkt. No. 246)). According to the sentencing memorandum filed in the district court by the government, Mr. Nix's relationship with Vistas (identified only as "Company A" but clearly Vistas based on other documents in that record, e.g. Dkt. No. 237), involved, among other things, Mr. Nix's award, as branch chief of the Army Contracting Agency – Americas, of contracts to Vistas after he had received payments from Vistas invoiced under a false company name (*id.,* Dkt. No. 242 at 1-2).

*Vistas' Claimed Costs*

Vistas is seeking $876,552.10 in costs related to the DCAA audit (app. post-hearing br. at 39). This amount includes the following:

| | |
|---|---|
| Consulting Fees and Cost | $567,835.32 |
| Samuel Zepeda | $118,328.24 |
| Maribel Zepeda | $ 69,389.56 |
| Maria Zepeda | $ 69,185.87 |
| Ignacio Zepeda | $ 51,813.11 |

(REA, tab D.1 at 47 (WP A-9, Summary of DCAA Audit Cost)) The consulting fees include $339,875 in "Audit Support" from Mr. Butler, plus $63,345.06 for his expenses such as airfare, lodging and meals (REA, tab D.8 at 67 (WP NN-4.1)). They also include $134,262 for George Munoz, Attorney/CPA for "Legal Fees in Propriety and Interpretation of Audit Results" and $22,949.51 in fees from the law firm Cohn Mohr (*id.*).

A. Louis Butler

The record contains a 21 January 2009 "Independent Consultant Agreement" between Vistas and Mr. Butler (supp. R4, tab 23). The agreement lists five work categories for Mr. Butler, including: the preparation of cost or pricing data in support of pending modifications; evaluation of the company's financial and accounting systems; consulting on the applicability of various procurement regulations; and interaction with DCAA (*id.* at 1-2). The agreement capped his total hours at 400 and his fees at $35,000, but also provided that the parties could agree that further services would be provided. Based on our review of the billing summaries provided in REA tab D.13, it appears that Mr. Butler eventually charged more than 2,300 hours to the audit work but neither party has directed us to an additional agreement between Vistas and Mr. Butler that governed his time above the initial 400 hours.

The itemization of Mr. Butler's time is contained in two different documents in REA tab D.13. The first is a 13-page spreadsheet entitled "Summary of Louis Butler CPA's Services in Connection with DCAA Audit in 2009" and covers the period from 21 January to 15 September 2009 (REA, tab D.13 at 36). The second document covers the period from 16 September 2009 to 11 April 2011 and is entitled "Summary of Consulting Total Hours and Fees for Louis R. Butler, CPA Subsequent to DCAA Field Audit Report" (REA, tab D.13 at 49). This document includes time for Mr. Butler on not only the DCAA audit, but also general services and REA preparation.

Both of these documents state the number of hours billed on each work day, and the hourly rate. The first document indicates that Mr. Butler worked 286 hours at $75 per hour and 1,128.5 hours at $125 per hour for a total amount billed of $162,512.50 (REA tab D.13 at 48). The second document indicates that Mr. Butler performed work on the audit totaling $113,843.75 (*id.* at 56). Adding these amounts ($162,512.50 + $113,843.75) equals $276,356.25, which is significantly less than the $339,875 that Vistas has included in the claim (REA, tab D.8 at 67). Adding to the confusion, Work Paper NN-4.1 states that Vistas' general ledger reflects an even lower number for Mr. Butler's time, $260,455, but under the heading "Adjustments and Reclassifications" an additional $79,420 is added to this amount to reach the amount claimed (*id.*). Mr. Butler did not address this in his testimony.

There are also other problems with Mr. Butler's time. There are significant blocks of time for which the description of Mr. Butler's services has been redacted. For example, all of his time from 17 April to 7 May 2010, a total of 162.5 hours, is redacted (REA, tab D.13 at 49). Further, there are other blocks of time charged to the audit claim for which Mr. Butler was providing other assistance to Vistas that was not audit support (tr. 2/176-77; REA, tab D.13 at 37). Mr. Butler also spent a large amount of time on the criminal investigation but he billed the work to the audit (tr. 2/101, 189-90; REA tab D.13 at 50).

With respect to the $63,345.06 that Vistas is seeking for Mr. Butler's expenses, Work Paper NN-4.1 indicates that Vistas' general ledger lists $38,912.23 in such expenses (REA, tab D.8 at 67). The remainder comes from another unexplained adjustment or reclassification to the general ledger. Vistas apparently expects us to simply accept the amount claimed despite a lack of testimony; in terms of support, Vistas has given us nearly 100 pages of bills to credit cards issued to Maria Zepeda. Vistas has not attempted to organize or explain these bills either through testimony or in its briefs. We decline the invitation to go through them line by line but it is obvious that many of the charges bear no relationship to Mr. Butler's expenses. Examples of such charges are a $2,640 charge to "Concrete Clinic, New Lenox, IL," airline tickets for various members of the Zepeda family, and a number of charges for DirecTV service (REA, tab D.13 at 99, 101, 113). We find that the claim for Mr. Butler's expenses has not been adequately supported.

## B. Other Consultants/Attorneys

The record contains $10,622.75 in bills from Mr. Oyer (REA, tab D.13 at 29-34) of which Vistas has allocated $7,403.75 without explanation to the audit claim (REA, tab D.8 at 67). The record does not contain any written agreement between Vistas and Mr. Oyer.

As for the $134,262 included in the claim for George Munoz, Attorney/CPA, other than a passing reference during Maribel Zepeda's testimony (tr. 2/13), no witness explained what services Mr. Munoz performed that furthered Vistas' response to the audit, nor has Vistas mentioned Mr. Munoz in its post-hearing briefs. In tab D.13, there are a series of invoices from Mr. Munoz from 2009 to 2011 that total $212,672.72 (REA, tab D.13 at 64). The bills appear to stem from Mr. Munoz's work as an attorney in that they are from "Law Offices of George Munoz" (*id.* at 66, 69, 78) and do not appear to involve any accounting work product. Eliminating work performed in 2011 (the year after DCAA issued its report) during which Mr. Munoz appears to have concentrated on the REA (*see id.*) leaves a balance of $134,423.62, which is close to the amount Vistas is seeking in the DCAA audit appeal for Mr. Munoz's work. However, at least some of the work Mr. Munoz performed in 2009 and 2010 appears to be related to preparation of the REA, for which Vistas has a separate appeal, or is for work unrelated to the Corps (*e.g.*, *id.* at 75) but Vistas has included it in the audit claim.

Finally, Vistas has included $22,949.51 in fees from the law firm Cohn Mohr. The REA contains an invoice from Cohn Mohr in this amount for work performed in May 2010, the month before DCAA issued its report (REA, tab D.13 at 23-27). Although there are numerous references to DCAA in these invoices, it is not entirely clear what Cohn Mohr had been tasked to do. The individual entries indicate that Vistas was concerned about a government claim under the Truth in Negotiation Act or the False Claims Act. For example, the invoice reflects that an attorney spent about 10 hours (at $360 per hour before a discount) on 27-28 May 2010 "Reviewing TINA Act cases for guidance on standards applied and elements of Government claim" and "Drafting memorandum on TINA and defective pricing." (*Id.* at 26) In the only testimony during trial about Cohn Mohr's involvement with respect to the DCAA audit support claim, Ms. Zepeda testified "I'm not sure if [Cohn Mohr] was involved here but probably not" (tr. 2/13).

## C. Vistas' Employees

With respect to the $308,716.78 Vistas is seeking for its four employees, these amounts are broken down in Work Paper NN-4.1, Analysis of Consultant, Legal and Accounting Cost (REA, tab D.8 at 67). Mr. Butler prepared this work paper (tr. 2/14). Curiously, it states that Vistas' general ledger contained only $13,267.86 in costs for these employees related to the audit (REA, tab D.8 at 67). However, under the heading "Adjustments and Reclassifications," Mr. Butler again added an additional amount - a very large amount in this instance, $295,448.92 - to bring the total to $308,716.78 (*id.*).

35

Neither Mr. Butler nor any other witness explained this adjustment/reclassification at the hearing. (In the one instance during the hearing that Mr. Butler was asked to explain one of the adjustments/reclassifications to the general ledger he could not explain it, stating that the information was on an "old laptop" he has in Houston (tr. 2/157-59)).

Work Paper NN-4.1 identifies the number of hours charged for each employee and the rate. The largest number of hours belonged to Vistas' president, Samuel Zepeda, who is listed as having worked 1,497.70 hours on the audit in 2009 and 2010. In addition, Maribel Zepeda is listed as having worked 1,145 hours, Maria Zepeda is listed at 1,146.5 hours and Ignacio Zepeda is listed at 719.52 hours. (REA, tab D.8 at 68). There are no time sheets or any other document in the record that evidences these hours. Samuel Zepeda did not testify so we have no explanation as to how he spent nearly 1,500 hours working on the audit. Although Ms. Zepeda testified to Mr. Salita's 18 visits to her office and the "grinding dialogue" that ensued, the testimony at the hearing was completely inadequate to explain how these four employees collectively spent a total of more than 4,500 hours on the audit.

Work Paper NN-4.1 also identifies the hourly rate charged for each of the four employees' time on the audit claim. With respect to Samuel Zepeda, it states that he had a "2008 Salaried Personnel Cost of $91,000" (REA, tab D.8 at 68). Elsewhere in tab D.8, Vistas submitted Work Papers FF-1.2 and FF-1.3 (each entitled "Payroll Summary") that identified Mr. Zepeda's 2009 "total gross pay" at $98,875.00 (*id.* at 30) and his total gross pay for the first nine months of 2010 to be $75,075.05 (*id.* at 39). Vistas did not use any of these amounts, however, in calculating the hourly cost of Mr. Zepeda for the audit support claim in Work Paper NN-4.1. Instead, Work Paper NN-4.1 uses hourly rates for 2009 and 2010 that are "Based on 1.5 Time Vistas 2008 Salaried Personnel Cost of $91,000 Plus 20% Fringes Benefits and Impacted by 7% Raise for 2009 and 2010" (*id.* at 68). Cutting through the math, Vistas is seeking an amount more than 50% higher than Mr. Zepeda's compensation during this period.[13] Vistas calculated the amounts it is seeking for the other three employees in the same manner (*id.*).

---

[13] After the government pointed out these issues during its cross-examination of Ms. Zepeda, on re-direct (after a 10 minute break) Ms. Zepeda contended that Mr. Zepeda's actual compensation was $165,000 and that the additional amounts had been paid to him in subsequent pay periods (tr. 2/65-66). We do not find this testimony to be credible. Ms. Zepeda admitted on re-cross that she could not identify any documents in this voluminous record that supported her assertion (tr. 2/68). Nor has Vistas identified any in its post-hearing briefs.

Vistas contends that the costs that it is seeking are allowable as costs incidental to contract administration, citing *Bill Strong Enterprises, Inc. v. Shannon*, 49 F.3d 1541 (Fed. Cir. 1995), *overruled in part on other grounds Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (en banc). In *Bill Strong*, the Federal Circuit considered whether consultant costs were allowable under FAR 31.205-33, Professional and consultant service costs.

The court of appeals first observed that there are at least three distinct categories of legal, accounting, and consultant costs in the contract cost principles: (1) costs incurred in connection with the work performance of a contract; (2) costs incurred in connection with the administration of a contract; and (3) costs incurred in connection with the prosecution of a CDA claim. The court held that the first two categories are presumptively allowable, if they are also reasonable and allocable, while the third category is unallowable. *Bill Strong*, 49 F.3d at 1549. The court also observed that the line between costs that are incidental to contract administration and costs that are incidental to prosecution of contract claims is "rather indistinct." *Id.* The court explained that:

> [T]he contractor and the CO usually enter a negotiation stage after the parties recognize a problem.... Although there is sometimes an air of adversity in the relationship between the CO and the contractor, their efforts to resolve their differences amicably reflect a mutual desire to achieve a result acceptable to both. <u>This negotiation process often involves requests for information by the CO or Government auditors or both, and, inevitably, this exchange of information involves costs for the contractor.</u> These costs are contract administration costs, which should be allowable....

*Id.* at 1549-50 (underlining added). In considering such claims, the Federal Circuit directed the Board to examine the objective reason why the contractor incurred the cost. If the contractor incurred the cost for the purpose of materially furthering the negotiation process, the cost normally is allowable under FAR 31.205-33 as a contract administration cost even if the negotiation ultimately fails. On the other hand, if the cost is incurred to promote the prosecution of a claim, then the costs are unallowable.[14] *Id.* at 1550.

---

[14] In its post-hearing brief, the government contends that Vistas' *Bill Strong* theory is a new theory. We agree that Vistas' position has evolved considerably in its post-hearing briefs and have considered whether we possess jurisdiction to entertain this claim. *See K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005-06 (Fed. Cir. 2015). While it was not the focus of Vistas' claim, Vistas did present its *Bill Strong* theory to the contracting officer. (Exec. summ. at 17

Under FAR 31.205-33(f), consultant fees are allowable only when supported by evidence of the nature and scope of service furnished. This subsection further provides that:

> Evidence necessary to determine that work performed is proper and does not violate law or regulation shall include-
>
> (1) Details of all agreements (*e.g.*, work requirements, rate of compensation, and nature and amount of other expenses, if any) with the individuals or organizations providing the services and details of actual services performed;
>
> (2) Invoices or billings submitted by consultants, including sufficient detail as to the time expended and nature of the actual services provided; and
>
> (3) Consultants' work products and related documents, such as trip reports indicating persons visited and subjects discussed, minutes of meetings, and collateral memoranda and reports.

48 C.F.R. § 31.205–33(f).

*Vistas' Employee Costs*

In considering Vistas' claim in light of FAR 31.205-33, one immediate problem for Vistas is that this regulation expressly excludes costs for officers or employees of the company. FAR 31.205-33(a) (2008). Accordingly, *Bill Strong* does not support Vistas position that the $308,716.78 it is seeking for its four employees are allowable. Moreover, even if these costs were potentially allowable, we would still deny them because Vistas has not proved its damages. As we have found, other than numbers written on a spreadsheet, there is no support for the hours alleged. Moreover, the amount sought is based upon a large increase in the amount reflected in Vistas' general ledger – from $13,267.86 to $308,716.78 – by virtue of an unexplained adjustment or reclassification. Finally, the hourly rates used by Vistas represent nothing more than wishful thinking on the part of Vistas in that they are more than 50% higher than the amounts actually paid to the employees in question.

---

(referring CO to legal opinion), at 74 (legal opinion citing FAR 31.205-33 and *Bill Strong*). Thus, we possess jurisdiction.

*The Consultant and Attorney Costs*

In considering the remaining portion of the audit claim (the consultant costs), a second line of cases is relevant. In *Orlando Helicopter Airways, Inc. v. Widnall*, 51 F.3d 258 (Fed. Cir. 1995), the government investigated the contractor for flight safety violations and fraud. After the Department of Justice conducted a criminal investigation that closed without any charges filed, the contractor submitted a claim for costs related to that investigation. *Id.* at 259. After the Board granted the government summary judgment based on the sovereign acts doctrine, the Federal Circuit affirmed. The court of appeals held that the government's police powers "are an ancient and fundamental indicia of sovereignty" and that the contractor lacked any remedy under the contract when the contracting officer did not initiate and direct the investigation. *Id.* at 262. As we have found, there is no evidence in this case that the contracting officer initiated or directed the criminal investigation.

A. Attorney Fees

Mindful of these considerations, we start with the bills from the attorneys at Cohn Mohr and George Munoz. First, as we have found, Vistas did not make any effort at the hearing to demonstrate why these fees are reasonable and allowable. No one from either of these firms testified and there were only passing references to these attorneys by other witnesses, which, in the case of Cohn Mohr, was Maribel Zepeda's testimony that she did not believe that Cohn Mohr had worked on the audit. Nor has Vistas addressed the attorney costs in its post-hearing briefs.

Second, Vistas has not brought to our attention any retainer agreement that explains the scope of work that either firm provided to Vistas. This, combined with the lack of testimony, leaves us uncertain as to the purpose for which Vistas retained these firms, particularly in light of the pending criminal investigation. Thus, Vistas has not met its burden with respect to FAR 31.205(f)(1). *See Fru-Con Constr. Corp.*, ASBCA Nos. 55197, 55248, 07-2 BCA ¶ 33,697 at 166,815 (lack of specificity in agreement with consultant used as a factor in reducing fees by about 90%).

Third, although Vistas included in the REA bills from both firms, some of the explanations as to the work performed lack sufficient detail or appear to be for work on something other than the audit, as we have found. For example, a bill for $10,000 from attorney Munoz for August 2009 states little more than that he talked to Vistas about the audit, reviewed "materials being submitted" to the government, and that he "worked on" the exit conference. Another entry for an out-of-pocket expense for Mr. Munoz states merely "Gen. Creer $3,911.12"; a few pages earlier, the bills stated that a "Ret. Robert Crear" had been retained for a $3,000 fee. (REA, tab D.13 at 73, 76) Presumably Creer and Crear are the same person, but there is no indication as to his line of work or what he did for Vistas.

For the foregoing reasons, we conclude that Vistas has not met its burden of demonstrating that it incurred these fees for the purpose of materially furthering the negotiation process or that they were reasonable. Vistas has not explained why it retained these firms, what they did (beyond the bare outlines in the bills), what work product they produced, or why the fees were in the amount billed.

### B. Darrell Oyer

With respect to Mr. Oyer, Vistas fails to meet the requirements of FAR 31.205-33(f). As we have found there is no written agreement that provides the details of the tasks Mr. Oyer was retained to perform. The record does contain invoices for Mr. Oyer but they lack sufficient detail as to the time expended and the nature of the actual services provided in that they merely state such things as "Visit to your office including prep and follow up," and "Review documents" (REA, tab D.13 at 31-32). The record does not appear to contain any work product for Mr. Oyer for the genuine purpose of materially furthering the negotiation process. Vistas did not address these fees in Mr. Oyer's testimony or in its briefs. There is no basis for us to award Vistas fees for Mr. Oyer.

### C. Louis Butler

With respect to Mr. Butler, the issue is more complex. As we have found, the record contains an Independent Consultant Agreement between Mr. Butler and Vistas that defines a scope of work, at least up to the first 400 hours. There also appears to be no dispute that Mr. Butler did, in fact, spend significant time on work related to the audit (*see* app. post-hearing fact br., ¶¶ 123-24).

On the other hand, there are a number of pieces of evidence that have to be construed as red flags. First, as we have found, Vistas is seeking $339,875 for Mr. Butler's time on the audit work but his billing summaries support only $276,356.25, reflecting an unexplained increase of more than $63,000. Vistas did not address this discrepancy at the hearing or in its briefs.

Second, there is no dispute that Mr. Butler spent a great deal of time on work related to the criminal investigation. In its brief, the government identifies a total of 454 hours of work between 18 October 2009 and 15 January 2010 that, based on Mr. Butler's testimony (tr. 2/190), may have been spent entirely on work related to the criminal investigation. We cannot determine how many hours Mr. Butler spent on work related to the criminal investigation, but we note that a portion of his testimony could be read to state that he actually spent half his time on the criminal work (tr. 2/189).

Mr. Butler attempted to justify his billing the criminal work to the audit claim by contending that the search warrant would not have been issued but for DCAA's cooperation with the criminal investigators (tr. 2/194). This is at best speculation. To

the extent that Vistas is asking us to carve out an exception to *Orlando Helicopter* simply because Mr. Salita cooperated with the FBI after the FBI made such a request, we decline that invitation.

Third, we do not believe it was reasonable for Vistas to allow Mr. Butler to bill more than 2,300 hours, considerably more than a full year of work at 40 hours per week. In comparable circumstances in *Fru-Con*, we held that consultant fees were not reasonable because the contractor's lack of oversight had almost given the consultant a blank check. *Fru-Con*, 07-2 BCA ¶ 33,697 at 166,815.

In terms of compliance with the FAR 31.205-33(f) requirements, the evidence is mixed. Vistas has provided us with its agreement with Mr. Butler, but it covers only the first 400 hours and $35,000 in fees. Vistas has also provided Mr. Butler's billing summaries but it is questionable whether many of the entries provide sufficient detail under FAR 31.205-33(f)(2). For example, entries from 20-25 February 2009 describe Mr. Butler's services as "Preparation of file analyzing historical project activity" and bills 44 hours to this activity. In terms of work products and related documents under FAR 31.205-33(f)(2), Vistas has directed our attention to several dozen emails authored by Mr. Butler, but nothing that would substantiate more than 2,300 hours of work. Some of Mr. Butler's work product is not in the record. When asked by the government's attorney where one could see the work product of his efforts for 20-25 February 2009, Mr. Butler testified that it "may be" on a laptop he has in Houston (tr. 2/175).

In *Fru-Con*, we recognized that the public policy identified in *Bill Strong* favors payment of the contractor's contract administration costs. However, because of the various deficiencies in the claim that we identified, we awarded the contractor about 11.5% of the amount claimed as a jury verdict. The Federal Circuit has held that to use the jury verdict method "[the Board] must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a [board] to make a fair and reasonable approximation of the damages." *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1358 (Fed. Cir. 2007) (quoting *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991)).

In this case, we are satisfied that the first two elements of this test have been met because Mr. Butler clearly performed work in response to the audit and that there is no more reliable method of calculating damages. With respect to the third prong of the test, the question is more difficult. Based on the issues we have identified, including the criminal investigation, the lack of a written agreement for hours above 400, the cursory nature of the billing records, the lack of work products to support the hours claimed, and the apparent blank check that Vistas gave Mr. Butler, any amount awarded to Vistas should represent a sharp reduction from the amount sought. After careful consideration of the record, we have determined that a fair and reasonable approximation of Vistas

41

damages can be achieved by awarding Vistas the $35,000 contemplated by its agreement with Mr. Butler.

Accordingly, this appeal is sustained in part.

### ASBCA No. 58486 – Impact of Bond Premium on Deleted Work

Vistas seeks $13,174.59 for what it describes as "unnecessary bond premium costs that Vistas paid for work that was deleted from the contract" (compl. ¶ 158). As we described above, in July 2010, P00017 deleted the work remaining on the contract but did not reduce the contract price (supp. R4, tab 28 at 40). No witness discussed this issue at the hearing and Vistas did not introduce any evidence that indicates that it paid more for bond costs than it received from the Corps.

In its post-hearing brief, the government observes, among other things, that the contracting officer approved total bond costs of $221,789 (see R4, tab 1 at 18). The government contends that because Vistas did not offer any evidence with respect to bond costs, let alone that it incurred more than $221,789, it is not entitled to any recovery. In its reply brief, Vistas contends that it incurred bond costs of $102,027.70 (app. reply at 53-54). Assuming that this is accurate, we do not see why this would entitle Vistas to bond costs of $13,174.59 in addition to the $221,789 approved by the contracting officer.

### DECISION

Vistas has not proven entitlement or quantum. This appeal is denied.

### ASBCA No. 58487 – Contract Reformation

In this appeal, Vistas sought $3,215,991.77 based on a contention that if it had known the actual site conditions and defective drawings issued by the Corps, it would have bid the project with a 21% profit rate (exec. summ. at 10). During its opening statement, Vistas' counsel stated that it did not intend to pursue this appeal (tr. 1/23) and it thereafter did not submit any evidence. Vistas stated in its post-hearing brief that it is withdrawing this appeal (app. br. at 1 n.1).

### DECISION

This appeal is dismissed with prejudice.

42

ADDITIONAL FINDINGS OF FACT

Because we draw upon the facts and analysis of Vistas' DCAA audit support costs appeal, familiarity with our decision in ASBCA No. 58483 is presumed.

Vistas seeks $1,268,288 for costs related to the preparation of its REA. This amount includes $850,314.93 for costs or estimated costs of its consultants and employees, plus G&A of 10.64% or $90,473.51, plus profit of $327,499.78 (REA, tab D.1 at 41 (WP A-5)).

The $850,314.93 includes $67,884.14 for outside consulting and legal costs through 30 September 2010 (REA, tab D.1 at 41). Vistas also seeks $286,267.59 in estimated costs for outside legal and consulting fees from 1 October 2010 to proposal submission (REA, tab D.1 at 41), bringing the total for consultant and legal costs to $354,151.73. According to Mr. Butler's billing records, he billed 1,598.5 hours and $199,812.50 to REA preparation (REA, tab D.13 at 60), which was in addition to the 2,300+ hours he billed for audit support. Further, there are bills from Attorney Munoz in 2011 for work relating to the REA that total $78,254.10 (*id.* at 64-71) and from Cohn Mohr from July 2010 to April 2011 in the amount of $36,780.50 (*id.* at 1-22). Finally, as we found above, the record contains $10,622.75 in bills from Mr. Oyer (REA, tab D.13 at 29-34) but Vistas has allocated $7,403.75 to the audit claim (REA, tab D.8 at 67), which effectively leaves, at most, a balance of $3,219 in work on the REA. Adding up these various amounts results in a total of $318,066.10 for the attorneys and consultants.

With respect to its employees, Vistas seeks an estimated $496,163.20 for eight individuals for "Involvement Above and Beyond Routine Employment Functions in the Preparation and Through Submission of REA Proposal" (REA, tab D.1 at 41). While the REA does not tell us how Vistas calculated these amounts, presumably Vistas used the same method that greatly increased the hourly rates for the DCAA audit claim that we rejected above. There is no documentation of the hours spent by the employees on the REA.

In the contracting officer's final decision, Ms. Nicholas rejected the REA preparation costs in their entirety because she found them to be unreasonable. Among other things, she observed that the $1,268,288.23 Vistas sought for proposal preparation costs exceeded the $1,154,494 to which she had concluded Vistas was entitled. She stated that the Corps had requested a "simple accounting" of Vistas' final costs but Vistas had responded with something much more complex. She found many of the documents provided by Vistas to be "confusing, unusable and unhelpful to the resolution of this matter." Ms. Nicholas stated that "it is my finding that Vistas' proposal did not materially further the negotiation process." (R4, tab 1 at 17)

43

DECISION

In its brief, the government agrees that REA preparation costs are generally allowable under *Bill Strong*. Vistas has submitted an REA that was much more time consuming to prepare than the total cost proposal that the Corps requested but contends that it was under no obligation to submit its costs in the format requested by the Corps. We agree but precedent, including *Bill Strong*, limits its recovery to reasonable costs and requires Vistas to prove those costs. In this case, Vistas' 44-volume REA is more confusing than helpful, relies on theories and calculations that are fanciful, unsupported, or barred outright, and fails to document anywhere near the amount of REA preparation costs that Vistas is seeking.

We also agree with the government that there is a serious question as to whether Vistas was in a litigation posture the entire time, which would bar it from recovering REA preparation costs. *Bill Strong*, 49 F.3d at 1549-50. For example, in the REA Vistas sought more than $3.2 million for contract reformation costs that it ultimately dropped on appeal (exec. summ. at 20). FAR 33.205(b) specifically requires the contracting officer to treat contract reformation as a claim. In addition, for the reasons set forth in this opinion, Vistas could not have reasonably believed that the government would pay many of the items that it sought, either because the amounts were so high, such as the profit claim, or they were outright barred, like the interest claim, or because the calculations were so convoluted and flawed, like the G&A claim. We conclude that either Vistas was in a litigation posture on at least significant portions of the REA from the outset or, to the extent it actually believed that the government would enter into negotiations, that belief was not reasonable. *See TMS Envirocon, Inc.*, ASBCA No. 57286, 12-2 BCA ¶ 35,084 (REA preparation costs rejected where expectation of negotiations was unreasonable); *Grumman Aerospace Corp.*, ASBCA No. 50090, 01-1 BCA ¶ 31,316 (claim preparation costs denied where contractor was in litigation posture from the outset).

We have examined the record carefully to determine whether a jury verdict award is feasible. As we have found, there is no record support for the time spent by Vistas' employees on the REA, and there are no agreements in the record between Vistas and Mr. Munoz, Cohn Mohr, or Mr. Oyer. Nor can it be said that there is an agreement between Mr. Butler and Vistas because the agreement that we discussed in connection with the DCAA audit support claim did not cover REA preparation. Neither Mr. Munoz nor anyone from Cohn Mohr testified. We have no doubt that Mr. Butler spent an enormous amount of time on the REA, as evidenced by his nearly $200,000 in bills. Although Mr. Butler's skills are surely impressive in certain areas, his skill in claims preparation on a government construction project is lacking. According to his testimony, he drew on his knowledge of "hospital accounting" to prepare the REA (tr. 2/132) but the result was an unwieldy REA that did not come close to achieving the lofty aims to which Vistas aspired.

On the other hand, the REA was not completely unsuccessful. As we found above, after the submission of the REA, the Corps made partial payments to Vistas totaling $2 million and the contracting officer awarded Vistas an additional $1,154,494 in the contracting officer's final decision. However, it is our conclusion that Vistas could have achieved these results more quickly and easily with a much simpler approach. As a jury verdict, we award Vistas $50,000, which represents about 25% of Mr. Butler's fees.

Accordingly, this appeal is sustained in part.

## CONCLUSION

For the foregoing reasons, we sustain ASBCA Nos. 58483 and 58488 in part. We deny ASBCA Nos. 58479, 58480, 58481, 58482 and 58486. We dismiss ASBCA No. 58487.

Dated: 12 January 2016

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58479, 58480, 58481, 58482, 58483, 58486, 58487, 58488, Appeals of Vistas Construction of Illinois, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

45